# Richmond

## Gordon L. Thaxton, Et Al. v. Commonwealth of Virginia, Ex Rel., Etc.

June 15, 1970.

Record No. 7202.

Present, All the Justices.

*L. Eldon James (C. Donald Robertson; James, Richardson and James; Braswell, Strickland, Merritt and Rouse,* on brief), for appellants.

*A. Grey Staples, Jr., General Counsel, State Corporation Commission, (Robert Y. Button, Attorney General; D. Gardiner Tyler, Assistant Attorney General; C. William Waechter, Jr., Assistant General Counsel, State Corporation Commission,* on brief), for appellee.

CARRICO, J., delivered the opinion of the court.

The question presented by this appeal is whether the State Corporation Commission properly ruled that Koscot Interplanetary, Inc., a foreign corporation, was transacting business in this state so as to require it to procure a certificate of authority pursuant to Code § 13.1-102 and so as to subject its alleged agent, Gordon L. Thaxton, to the penalty of a fine under Code § 13.1-119 for its failure to procure such certificate.

The record reveals and the briefs concede that Koscot's business is two-fold in nature. Koscot is engaged in the distribution and sale of cosmetics, an activity which was admitted by the Commonwealth from the outset to be "exclusively interstate," not requiring domestication in Virginia. This phase of the business is not in issue here. The other activity is what Koscot calls "establishment of the wholesale sales network" and what was termed by the Commission in its opinion as "the endless-chain money-making business." This phase of the business is what is involved here.

The Commission ruled that Koscot had "conducted locally" in Virginia its "endless-chain business" without a certificate of authority. The Commission held that Thaxton was "the agent of Koscot" and imposed upon him a fine of $250 for Koscot's failure to procure the certificate. Both Thaxton and Koscot have appealed.

Koscot, which means "Kosmetics For the Communities of Tomorrow," was incorporated in Florida in 1967 for the corporate purposes of selling and distributing cosmetics and engaging in "all other lawful businesses" in Florida and elsewhere. It established a detailed corporate structure as shown on an "Organizational Chart" published by it in a "Distributor's Manual" and here reproduced:

# KosCOT INTERPLANETARY, INC.
## Organizational Chart

Chairman—Board of Directors

Board of Directors

President—KosCOT, Inc.

Executive Vice-President

| Vice-President of Kosmetics | Vice-President of Administration | Vice-President of Marketing & Sales |
|---|---|---|

| National Trainer | Research Director | Treasurer | Corporate Attorney | Mail Room | Promotion & Advertising | National Trainer |
|---|---|---|---|---|---|---|

National Director

| Northern Territorial Director | Southern Territorial Director | Eastern Territorial Director | Western Territorial Director |
|---|---|---|---|

50 State Directors

Area Chairman—Board of Directors

KosCOT Directors

KosCOT Supervisors

KosCOT Co-ordinators

KosCOT Advisors

The "Co-ordinators" and "Advisors" shown at the bottom of the chart are the persons designated to carry on the local retail activities of Koscot. Their part in the Koscot program is not involved in this controversy.

At issue is the role in the "endless-chain business" of Koscot's "Directors" and "Supervisors," shown near the bottom of the chart. These categories represent persons holding on the local level non-exclusive, cancelable wholesale distributorships of Koscot's products.

An interested person becomes a director, the position held by Thaxton, by executing a "Distributor Application and Agreement" under the sponsorship of an existing director and by paying Koscot $4,500 by cashier's check. The sponsoring director is paid $2,500 by Koscot for bringing the new director into the organization. As a director, the new man is entitled to recruit others to become directors, receiving from Koscot $2,500 for each new participant.

A supervisor enters the program by executing an application and agreement under the sponsorship of an existing director or supervisor and by paying Koscot $2,000 by cashier's check. The sponsoring party is paid by Koscot $500 as a "finder's fee." If the new supervisor is sponsored by an existing director, the latter is also paid by Koscot $250 as an "override" on the merchandise furnished by Koscot to the supervisor upon his entry into the program. As a supervisor, the new entrant is entitled to recruit others to become supervisors, receiving from Koscot $500 for each new participant.

A supervisor works under the director who sponsored him. A supervisor may advance to director by paying Koscot $2,500 which is in turn paid to the sponsoring director as a "release fee" to compensate for loss of the supervisor. The advancing supervisor must also secure a replacement for himself in the sponsoring director's organization, the new supervisor paying Koscot $2,000 to enter the program. From this amount, the old supervisor receives a "finder's fee" of $500 and the old director receives a $250 "override" on the merchandise furnished the new man by Koscot. The old director also receives a 2% dividend on the total volume of future business handled by the newly advanced director.

According to literature prepared by Koscot, a director "will earn over $143,000 a year" from "release fees," "finder's fees," and "overrides" if he uses the enlistment-replacement process and promotes one supervisor to director each month. The same literature states that in addition to the $143,000, the existing director "can be receiving . . . $144,000 a year . . . in two years' time" from the 2% sales dividend

if he sponsors "only five" new supervisors into the program each month and promotes the same number of supervisors to director in the same period.

Directors and supervisors in a given local area form, pursuant to the program set up by Koscot, an association for the recruitment and training of new participants. The primary part of the recruitment campaign for directors and supervisors is carried out in "Golden Opportunity Meetings" where the advantages of becoming a wholesaler are stressed and prospects are encouraged to enter the program. If a prospect shows interest, the director or supervisor who invited him to the meeting attempts to secure his signature on a "Distributor Application and Agreement" and his cashier's check for the required amount.

Training is required of all participants on both the wholesale and retail levels of Koscot's program. The training is carried out in schools conducted in the local area. One of the conditions for advancement by a supervisor to the director level is that he attend a four-day school for instruction "in all of the facets from . . . setting up retail operations . . . to setting up additional wholesale operations."

The Commonwealth contends that Koscot, in building its "endless-chain business," has, through its officers and agents, engaged in local activities constituting the doing of business in Virginia requiring it to domesticate under Code § 13.1-102. The activities of Koscot in Virginia relied upon by the Commonwealth are:

1. Conducting "Golden Opportunity Meetings."
2. Conducting training schools.
3. Making contracts for wholesale distributorships with persons who become directors and supervisors.

Koscot does not deny that recruitment meetings and training schools are conducted in Virginia or that there is solicitation in this state of persons to enter into agreements to become wholesale distributors. In fact, Koscot freely admits that these activities take place. It insists, however, that the activities are not carried on by it but by the local directors and supervisors who are independent contractors.

Koscot points to a provision of its "Distributor Application and Agreement," which directors and supervisors are required to execute, stating that the participant is an "independent contractor" and "not an employee, servant, agent, or legal representative" of Koscot. Koscot also relies on the testimony before the Commission of sev-

eral distributors who described themselves as "independent businessmen."

Koscot admits that its corporate officers come into Virginia and take part in "Golden Opportunity Meetings" and in training schools. It says, however, that on these occasions the officers are mere "guest speakers" appearing at the invitation of the local directors and supervisors and that the officers do not conduct recruitment meetings or training schools.

But just because Koscot and its distributors contract that the latter shall bear a particular label and understand that in the jargon of the organization the corporate officers are called something else on certain occasions does not necessarily make all that legally so. *Scripto, Inc.* v. *Carson*, 362 U.S. 207, 211 (1960). Koscot agreed at the Commission hearing that it was "a pure question of fact" whether the local activities in Virginia were being carried on by its officers and those who were its agents or, instead, by independent contractors. And Koscot stated in argument before us that it was "a question of fact" whether Thaxton, one of its Virginia directors, was acting for it or as an independent contractor in procuring a "Distributor Application and Agreement" and a certified check for $4,500 from one Wayne W. Davis as a new director in Danville.

The Commission found as a fact that the activities of Koscot in setting up its wholesale distributorships were conducted in this state by its officers and those who were its agents. Under § 156(f) of the Virginia Constitution, "the action of the Commission . . . shall be regarded as prima facie just, reasonable and correct." A finding of the Commission "will not be disturbed by us 'unless it is contrary to the evidence or without evidence to support it.'" *Security Bank* v. *Schoolfield Bank*, 208 Va. 458, 461, 158 S.E.2d 743, 745 (1968).

Koscot, while advancing an argument that to require it to domesticate would violate the Commerce Clause of the United States Constitution (Article I, Section 8), recognizes the import of the Commission's factual finding that it conducted local activities in this state through its officers and agents. Koscot concedes in its brief that if it "directly or though its agent[s] set up wholesale distributorships . . . in the State of Virginia . . . then it is doing business in the state and must obtain a certificate of authority."

The real issue, therefore, is whether there is evidence to support the Commission's factual finding, for if there is, Koscot admittedly would be required to domesticate and any argument based

upon federal constitutional grounds would be beside the point. We are of opinion that there is ample evidence to support the Commission's finding.

At the outset, we emphasize the conceded dual nature of Koscot's business and focus attention solely on that side of the business relating to the pyramidal sale of distributorships from which Koscot receives substantial financial return. The latter activity, at the time of the Commission hearing at least, was all that Koscot had undertaken in Virginia, since no retail sales of cosmetics were shown to have yet occurred in this state.

In promoting the sale of its distributorships, Koscot works primarily through "Golden Opportunity Meetings" held in the local area. Local distributors invite prospective purchasers to the meetings and importune them to sign up as directors for the sum of $4,500 each or as supervisors for $2,000 each.

Koscot contends that it does not "conduct" the meetings but that they are "put on" by the local associations of distributors. Koscot also says that although its corporate officers appear and speak at the meetings, they do so only at the request of the local associations and then are mere "guest speakers."

While, as will be seen later, the distributors are required to establish and maintain "Golden Opportunity Meetings," documentary evidence in the record shows that Koscot itself schedules such meetings and announces in advance the names of its officers who will appear as speakers. In addition, Koscot provides a prepared format setting forth exactly what each participant in the program, other than the "guest speaker," is to say and when he is to smile or gesture. On one occasion, when a change was required in the format, Koscot instructed the local distributors to "make sure" the new material was "utilized in all opportunity meetings." Participants in "opportunity meetings" are told "what to say," according to the testimony of a Koscot officer, because Koscot does not want them to "tell . . . a lie."

The training schools called for in Koscot's program are designed not only to instruct the personnel in the marketing of products but also in the merchandising of distributorships. The record shows that Koscot itself schedules these schools and "sends instructors out from Florida." In one instance, Koscot notified its personnel that the location of a school in Northern Virginia had been changed and that "Professor Terrell Jones, M.G.S., A.A., S.B.," Assistant Chairman of the Board of Koscot, would appear and speak at a "Director's

Training Klass and Opportunity Meeting" at the new location on a specified date.

And, importantly, the training schools are financed by Koscot. Upon the purchase of each distributorship, Koscot forwards the sum of $300 to the local association of which the new distributor is a member for his training in the Koscot program. If, after his initial training, the distributor "is not successful," Koscot, at its expense, trains him "over and over . . . until he totally understands how to make a decent living in [the] company."

Thus, it is seen, Koscot, through its own officers, directly takes part in local activity in Virginia directed to promotion of sales of wholesale distributorships. This, alone, would be sufficient to sustain the Commission's action.

There is more, however, tying Koscot to local activity in Virginia. The local distributors are shown by the record not to occupy the "independent contractor" status Koscot has portrayed for them. In the "Organizational Chart," heretofore reproduced, the wholesale distributors, listed there as "Directors" and "Supervisors," are shown as part of the *corporate* structure of Koscot. The chart does not pretend to classify the distributors as part of an independent sales group.

The prepared format for "opportunity meetings," prescribed by Koscot, provides that the presiding officer, who is a local distributor, open the meeting by saying:

> "Good evening, ladies and gentlemen! My name is . . . and *on behalf of KOScot Interplanetary Inc.*, I would like to welcome you to the most unusual evening of your lives—a 'KOScot Golden Opportunity Meeting!' " [Emphasis added.]

Koscot pledges its distributors in writing to "live and abide by" a detailed and strict "Distributor's Code of Conduct" under pain of discharge by Koscot. One of the requirements of the eighteen-paragraph "Code of Conduct" is to "[o]bserve, uphold and abide by all KosCot General Company Rules and Special Regulations for Distributors." There are twenty-three "General Rules for Distributors" and numerous specific rules applicable to the particular category of distributorship.

One of the "General Rules" is that "[n]o deviation of KosCot marketing plan will be tolerated." The marketing plan contains a specific rule applicable to director-distributors stating that "directors

are responsible for the establishing and maintaining of 'Golden Opportunity' Meetings."

The holding of "Golden Opportunity Meetings" is Koscot's way of establishing its "wholesale sales network." Thus, contrary to the assertion that it "is not required by Koscot that the wholesale distributors take part in the setting up of the wholesale sales network," the director-distributors are bound to take part in such activity. And, in doing so, they are subject to all the various rules imposing control over them by Koscot, facing immediate discharge for violation.

All this, in our opinion, reduces the relationship between Koscot and one of its local directors to that of master and servant and removes from the director the self-stamped label of "independent contractor." The right to control and the power to discharge are inconsistent with the status of independent contractor and are the usual marks of the relationship of master and servant. *Texas Company* v. *Zeigler*, 177 Va. 557, 568-569, 14 S.E.2d 704, 708-709 (1941).

This brings us to the role of Thaxton, a Virginia director and an appellant here, in signing up Wayne W. Davis as a new director in Danville. Thaxton secured Davis' signature in Danville on a "Distributor Application and Agreement" and his cashier's check for $4,500. Thaxton also executed the agreement as sponsoring director and forwarded it and the check to Koscot in Florida.

Koscot argues that Thaxton had no "authority to give final approval" to the agreement and that no contract was thereby made in Virginia. Koscot first asserts in its brief that the "agreement specifies that it is to be governed by the laws of Florida." However, an examination of the document shows that it contains no such provision.

Koscot also asserts that the agreement was sent by Thaxton to its home office for "acceptance or rejection" and that a contract did not come into existence until the agreement "was accepted" by the home office of Koscot in Florida. However, an examination of the document reveals no provision that it was subject to acceptance by the home office of Koscot. There is no place on the form for a signature in behalf of Koscot other than by the sponsoring "Supervisor or Director." When Thaxton placed his name on the document as sponsoring director and accepted Davis' check for $4,500, the contract was complete.

We hold that the evidence sustains the Commission's finding that Thaxton was "the agent of Koscot" in procuring the contract from

Davis and accepting the latter's check for $4,500. The evidence also sustains the Commission's finding that Koscot's "endless-chain business . . . is conducted locally in Virginia, and Koscot cannot legally conduct this branch of its business in [this state] without domesticating."

The order of the Commission will be affirmed.

*Affirmed.*