120 N.J. Super. 216 (1972)
293 A.2d 682
GEORGE F. KUGLER, JR., ATTORNEY GENERAL OF NEW JERSEY, PLAINTIFF,
v.
KOSCOT INTERPLANETARY, INC., A FLORIDA CORPORATION, AND GLENN W. TURNER, DEFENDANTS.
Superior Court of New Jersey, Chancery Division.
Decided July 26, 1972.
*220 Mr. Richard W. Grieves, Deputy Attorney General, and Mr. Elias Abelson, Assistant Attorney General, Attorneys for plaintiff.
Messrs. Gross, Demetrakis & Donohue (Mr. Richard J. Donohue), Attorneys for Defendants.
*221 MEHLER, J.S.C.
This is an action brought by the Attorney General under the Consumer Fraud Act, N.J.S.A. 56:8-1 et seq., the New Jersey Antitrust Act, N.J.S.A. 56:9-1 et seq., and the Corporation Act, N.J.S.A. 14A:13-11.
The defendants are Koscot Interplanetary, Inc. (Koscot), a Florida corporation, which is engaged in the sale and distribution of cosmetics through non-exclusive distributorships throughout the United States, and Glenn W. Turner, who founded Koscot, and at all times relevant to this action was chairman of its Board of Directors and its principal, if not sole stockholder.
The Attorney General charges that defendants have employed fraudulent and deceptive practices in connection with the sale of Koscot distributorships to residents of New Jersey and that its multilevel distribution program is predicated upon a referral sales and pyramiding concept which is inherently fraudulent and deceptive within the meaning of N.J.S.A. 56:8-2. At the commencement of this action that section provided, in pertinent part, as follows:[1]
The act, use or employment by any person of any deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby, is declared to be an unlawful practice; * * *.
The Attorney General is specifically authorized to bring an action under the Consumer Fraud Act by N.J.S.A. 56:8-8, which at the time of the commencement of this action provided, in pertinent part, as follows:[2]
*222 Whenever it shall appear to the Attorney General that a person has engaged in, is engaging in or is about to engage in any practice declared to be unlawful by this act he may seek and obtain in an action in the Superior Court an injunction prohibiting such person from continuing such practices or engaging therein or doing any acts in furtherance thereof. * * * In addition, the court may vacate or annul the charter of a corporation created by or under the laws of this State, revoke the certificate of authority to do business in this State of a foreign corporation, and revoke any other licenses, permits or certificates issued pursuant to law to such person which have been or may be used to further such unlawful practice. The court may make such orders or judgments as may be necessary to prevent the use or employment by a person of any prohibited practices, or which may be necessary to restore to any person in interest any moneys or property, real or personal which may have been acquired by means of any practice herein declared to be unlawful.
The charge that defendants have violated the New Jersey Antitrust Act is predicated on the allegation that the limitation which Koscot imposes on its distributors in contracts with them are unlawful restraints of trade, specifically in violation of N.J.S.A. 56:9-3, which declares that 
Every contract, combination in the form of trust or otherwise, or conspiracy in restraint of trade or commerce, in this State, shall be unlawful.
Authority to institute proceedings in this court to prevent and restrain violations of the Act is granted to the Attorney General by N.J.S.A. 56:9-10(a).
The charge under the Corporation Act, N.J.S.A. 14A:13-11, is predicated on the allegation, which is not disputed, that Koscot, a foreign corporation, did business in New Jersey in 1969 without a certificate of authority issued by the Secretary of State.
The Attorney General seeks the following relief: (1) A declaration that specific practices complained of are in violation of N.J.S.A. 56:8-2; (2) an accounting of all moneys received by Koscot from New Jersey residents in connection with the sale to them of distributorships; (3) a declaration that the contracts between Koscot and its New Jersey distributors are null and void as being violative of the public *223 policy of New Jersey as embodied in N.J.S.A. 56:8-2, 56:8-2.2, and N.J.S.A. 56:9-3, 56:9-4(a); (4) restoration by defendants of all moneys acquired by practices violative of N.J.S.A. 56:8-2 or N.J.S.A 56:8-2.2 from persons who entered into contracts with Koscot; (5) a declaration that defendants have engaged in contracts, combinations or conspiracies in restraint of trade or commerce in New Jersey in violation of N.J.S.A. 56:9-3 and have combined or conspired to monopolize trade or commerce in violation of N.J.S.A. 56:9-4(a); (6) injunctive relief barring the specific practices allegedly violative of N.J.S.A. 56:8-2, 56:8-2.2 and N.J.S.A. 56:9-3, 56:9-4(a); (7) imposition of civil penalties against defendants as provided in N.J.S.A. 56:8-13, N.J.S.A. 56:9-10, and N.J.S.A. 14A:13-11, and (8) revocation of Koscot's certificate of authority to transact business in New Jersey.

I
Koscot, whose principal office is in Orlando, Florida, was incorporated in 1967. Although it began to do business in New Jersey in 1969, it did not obtain a certificate of authority to do so from the Secretary of State until November 10, 1971. From February 1969 to February 1971 Koscot offered for sale and sold distributorships in New Jersey, as it had been doing elsewhere, which entitled the purchaser to participate in the Koscot marketing plan in two capacities, namely, "retail", i.e., the sale of cosmetics, and "wholesale", i.e., the recruitment and sale of further distributorships.[3] Both segments of the marketing plan provided for the compensation of distributors through a system of commissions related either to the sale of the product or the sale of distributorship positions.
*224 The marketing program which was in effect in New Jersey may be characterized as a multilevel distribution plan. During the initial period of operation here the program consisted of four positions, known as Director, Supervisor, Coordinator and Beauty Advisor. Persons on each of the levels were permitted to sell products at rental with buying discounts ranging from 35% for Beauty Advisors to 65% for Directors. Directors and Supervisors were encouraged to solicit investments from potential participants in order to earn finder's fees ranging from $500 to $2500.
Beginning in the fall of 1969, the marketing plan was modified both as to form and substance. The position of Co-ordinator, which was the second level retail position, was eliminated and the highest position became known as Distributor in lieu of Director. Under the new plan, the system worked essentially as follows: To become a Supervisor one paid $2,000 to Koscot, for which he was credited with inventory of a like dollar amount at retail value. To become a Distributor one paid $5,000 to Koscot and was credited with inventory of a like dollar amount at retail value. Both investment levels provided for company training courses. A Supervisor obtained a buying discount of 55% on future purchases of product and a Distributor obtained a 65% buying discount. They could sell the product themselves and earn the full discount or engage Beauty Advisors, who sold product at a buying discount of 40% obtained through their sponsoring Supervisor's or Distributor's account. Thus a Supervisor, on sales made by him, earned a commission of 55% and on the volume of retail sales made by his Beauty Advisor earned an override or commission of 15%. A Distributor earned a full commission of 65% on sales made by himself and an override or 25% commission on the volume of retail sales made by his Beauty Advisor. Additionally, he became entitled to a 10% commission on the volume of sales made by or through his Supervisor.
The "wholesale" aspect of the new marketing plan operated as follows: A Supervisor was paid a finder's fee by Koscot *225 when he obtained a new Supervisor. A Distributor who enrolled a new Supervisor received $700 from Koscot, $500 of which was paid as a finder's fee, the additional $200 representing a 10% override on the new recruit's mandatory new product order of $2,000. A Supervisor could move up to the level of Distributor only by purchasing an additional inventory of $3,000 and by sponsoring another Supervisor as his replacement in his sponsoring Distributor's organization. Such a move-up produced for the sponsoring Distributor commissions totalling $2,850. Thus, finder's fees and commissions had no connection with retail sales made to the ultimate consumer, but were paid solely for bringing new investors into Koscot's marketing program.
Through the period of active solicitation of new distributors in New Jersey Koscot sold 624 Supervisor positions and 387 Distributor positions. The total investment by New Jersey residents in these positions exceeded three million dollars.
The principal, if not the sole, method of recruiting distributors was by means of a public presentation known as the Golden Opportunity meeting, supplemented by a charter flight program to Koscot's home office in Orlando, Florida, known as the GO (for Golden Opportunity) Tour. The form and substance of Golden Opportunity meetings were in all material respects uniform and in accordance with Koscot directives. The format for these meetings was set forth in a script prepared and published by Koscot. Those who conducted the meetings followed the script in accordance with Koscot training and policy.
Golden Opportunity meetings consisted of several segments. They included a general introduction, a film about Turner and the origins of Koscot, the "Alice" portion devoted to retail sales by Beauty Advisors, a discussion of the retail income to be earned by Distributors and Supervisors, a presentation of the wholesale aspect of the program, and finally, a comprehensive review known as the "double back."
*226 Large earnings of a size to allure the hearers was the theme of the Golden Opportunity meetings. Some of them were presented without sufficient basis or information to support and justify them. The bases of others were contrary to the fact. Thus, although there were numerous representations regarding the number of customers a Beauty Advisory might expect to have at a party,[4] the number of parties per month and the re-order potential which was said to be 100%[5] with the Beauty Advisors themselves earning over $8,000 a year "working far less hours than the average woman and earning far more," defendants had neither experience in marketing nor the results of independent studies to justify the representations.
Having established the potential earnings of Beauty Advisors, the presentation then proceeded to a discussion of incomes to be realized by Supervisors and Distributors through retail sales. The presentation was such as to lead a hearer to believe that building a sales organization of Beauty Advisors was not difficult, although, as appears from the evidence, it was extremely difficult to engage and retain girls to work as Beauty Advisors. The hearers were then informed that before long a Supervisor could expect to earn retail sales commissions of over $17,000 a year and a Distributor could soon expect to earn over $50,000 a year from retail sales. It was flatly stated that many Koscot Distributors were presently earning "this kind of money ($50,000) and more," although no Koscot Distributor had ever achieved annual retail sales commissions in excess of $50,000.
*227 Although the statements relative to retail sales related to the retail aspects of Koscot, it is perfectly clear that the figures presented were intended to induce the hearers to purchase Supervisor and Distributor positions by leading them to believe they would earn these exceedingly large projected commissions.
The defendants contend that the statements were not intended as representations to be relied on, but were intended as projections or illustrative examples of the way the system worked. It is their position that "if one accepts the average figure as a premise, any hypothetical construct [sic] built on that premise will form a valid syllogism." I find it difficult to understand why a "valid syllogism" may not also be deceptive and misleading. If a syllogism begins with a false premise, it will result in a false conclusion. I find also that caveats or warnings that not every one would earn such incomes were inconspicuous and ineffective especially in view of the admitted fact that no one had earned such large amounts from retailing Koscot products.
Defendants also contend that the examples or projections should be considered "mere puffery" and as such are to be tolerated as commonplace in modern business. It must be noted that the Consumer Fraud Act was enacted for the very purpose of preventing some practices which may indeed be pursued in modern business. As Dr. Westing, a professor of business at the University of Wisconsin Graduate School of Business, testified, there are degrees of exaggeration, some of which can be harmful. As an example, a statement that someone is earning $50,000 when in fact no one is or it is not feasible may readily be harmful. As was said in Goodman v. Federal Trade Commission, 9 Cir., 244 F.2d 584, 603 (1957), statements made to prospective purchasers which are aimed to induce a purchase by them may not be characterized as mere "puffery." There the court said:
It should be added that we are not in the realm of civil torts. Even in that realm the old rule of caveat emptor has been abandoned, in favor of the more ethical attitude that one dealing with another in *228 business had the right to rely upon representations of facts as the truth. And the Supreme Court has applied with great consistency this approach in dealing with the Federal Trade Commission by stating, in a leading case:
"The fact that a false statement may be obviously false to those who are trained and experienced does not change its character, nor take away its power to deceive others less experienced. There is no duty resting upon a citizen to suspect the honesty of those with whom he transacts business. Laws are made to protect the trusting as well as the suspicious. The best element of business has long since decided that honesty should govern competitive enterprises, and that the rule of caveat emptor should not be relied upon to reward fraud and deception." (Emphasis added).
Defendants also say that the ever increasing flow of retail sales and commissions 
is too simplistic for anyone to believe. For one thing, it ignores a basic factor. Not even a naive Koscot distributor believes that ipso facto he has a substantial clientele regularly repurchasing cosmetics. In this type of product area much depends on one's attitude toward the product, developing a liking to it, and consuming first what remains of cosmetics of other producers. One does not at once abandon the brands one has been using and plunge wholeheartedly into Koscot products without first experimenting and comparing products both as to quality, appearance and cost.... So much depends on factors beyond the control of anyone in Koscot.
I find that none of these limiting factors of potential income was mentioned at the presentation and that their absence or omission further added to the misleading and deceptive character of the projections. It is also to be noted that the statute may be violated even though one has not in fact been misled or deceived by an unlawful act or practice.
The prospect of earning commissions by recruiting others was offered by defendants as a substantial inducement to join the Koscot marketing program. This wholesale aspect of the program was stressed at the Golden Opportunity and GO Tour meetings and at the business management schools which new Distributors and Supervisors were obliged to attend for four days, 60% of the time being devoted to the wholesale aspect. It was there that they learned various techniques to recruit prospective investors. One was the cold *229 canvass method, which involved approaching strangers to induce them to attend Golden Opportunity meetings. Another was the curiosity approach by which one would stop a stranger and ask how he would like to double or triple his income and earn $50,000 a year. Distributors and Supervisors were instructed to appear to be successful by driving expensive automobiles and displaying $100 bills.
In an endeavor to earn wholesale commissions, they made every effort to bring prospects to Golden Opportunity meetings and to have them sign contracts at the conclusion of the meeting. There, representations were made to the effect that annual earnings from $26,000 to $52,000 and more were available to Distributors by their helping people they sponsored to become successful Distributors. Yet only five New Jersey Distributors earned more than $26,000 in one year as the result of sponsoring new Distributors.
High pressure salesmanship was employed. False enthusiasm was invoked. A Go Go Go chant and a money hum were characteristics of the meetings. And checks for wholesale commissions were passed out.
A prospect who did not sign following a meeting but evinced an interest in obtaining further information was induced to go on a GO Tour,[6] to which he was told to bring a certified check. While on the plane great efforts were made to "close" prospects, that is, have them sign contracts before the plane landed in Florida. A theme of Koscot was "Get the check." On the plane references were made to the success of others. Large amounts of money were displayed; *230 money was flashed up and down the aisle amid talk of success and at times piles of cash and contracts were dropped in the laps of prospects, particularly those who still appeared to be reluctant, because "money excites people." Many signed contracts before they disembarked.
Upon arriving in Florida the prospects, who had come from New Jersey and other parts of the country, were taken on a tour of the company facilities, after which they attended a large Opportunity meeting conducted by Koscot personnel. References were made to the position of Golden Eagle, which apparently represented one whose commissions exceeded $150,000. Below the Golden Eagle were Silver and Bronze Eagles followed deprecatingly by a Buzzard, so called because his commissions totalled a mere $20,000, although in fact this amount was substantially in excess of the earnings of the overwhelming majority of Koscot distributors.
Koscot denies liability for any misrepresentations which they say may have been made or fraudulent practices which they say may have been conducted by distributors, on the ground that they were independent contractors. I find this contention to be without merit. Although the contracts beween Koscot and its distributors provide that each distributor agrees to the following:
I shall be in business on my own account as an independent contractor. I am not an employee, servant, agent or legal representative of Koscot Interplanetary, Incorporated. * * *
it is well established that courts of equity will go behind the form of a contract or relationship to its substance. In the present case, the statements and omissions of the distributors at Golden Opportunity meetings are those taken from the Distributor's Training Manual supplied by Koscot for use by the distributors to persuade or induce others to enter into distributorship contracts directly with Koscot. Many, if not most, of the Golden Opportunity meetings and GO Tours were organized and conducted by the Koscot State Director, who was an employee of Koscot, or by area sub-directors, *231 who were persons chosen by the State Director for this purpose. Golden Opportunity meetings in Orlando, held on the first leg of the GO Tour, were repetitions, by Koscot employees, of the Golden Opportunity meetings held in the State.
Not only were the words and diagrams used those supplied by Koscot, but even the mood and atmosphere of the meetings were set according to the directions found in the Distributor's Training Manual. The contractual relationship entered into by new distributors who were signed up at the meetings and on tours was between Koscot and the distributors. The consideration ($5,000 or $2,000) was forwarded directly to Koscot. So anxious was the company for these moneys that no applicant was ever rejected. It is plain that the expansion of Koscot's marketing program came about through the active recruitment of distributors by those already participating in the program as distributors.
The major portion of Koscot's revenues was derived from the sale of distributorships rather than from the sale of cosmetics. According to Dr. Westing, such revenue accounted for a substantial amount of Koscot's capitalization, which he characterized as a contribution by distributors on an interest-free basis; money which the company used for its operations. Consequently, the company, as well as the distributors, benefited from the conduct of its distributors.
It is clear that whether or not the statements were made by independent contractors or agents, they were authorized and even directed by Koscot. Having so controlled the situation for its own benefit, Koscot may not now, on the basis of a contract which it drafted, disclaim liability and hold out its "independent contractors" as a shield for its wrongdoing. Thaxton v. Commonwealth, 211 Va. 38, 175 S.E.2d 264 (1970), a case involving Koscot. As the court said in Goodman, supra, at p. 592 of 244 F.2d, in reviewing the action of the Federal Trade Commission in a consumer fraud sales action in which a similar defense was interposed:
*232 Here, the agent was clothed with apparent and, we think, real authority to speak and act for and on behalf of the principal, and the latter is bound thereby. We know of no theory of law by which the company could hold out to the public these salesmen as its representatives, reap the fruits from their acts and doings without such liabilities as attach thereto.
Koscot's distribution program is predicated upon a referral sales and pyramiding concept, a practice which is known as referral or pyramid sales. It is an arrangement whereby one is induced to buy upon the representation that he can not only regain his purchase price, but also earn profits by selling the same program to the public. It thus involves the purchase of the right to sell the same right to sell.
A pyramid type practice is similar to a chain letter operation. Such a program is inherently deceptive for the seemingly endless chain must come to a halt inasmuch as growth cannot be perpetual and the market becomes saturated by the number of participants. See e.g., State by Lefkowitz v. ITM Inc., 52 Misc.2d 39, 275 N.Y.S.2d 303 (Sup. Ct. 1966). Thus many participants are mathematically barred from ever recouping their original investments, let alone making profits. Four State legislatures have specifically legislated against pyramid sales. Va. Code Annot. 59.1-67.1, 67.2, 67.3; Pa. Stat. Annot. 73 Purdon Sec. 201-1 et seq.; Iowa Code Annot. Sec. 713.24, subd. 2, par. b; Fla. Stat. Annot. Sec. 849.091. New Jersey has not by name proscribed referral or pyramid sales However, N.J.S.A. 56:8-8 gives the Attorney General the broad power to prosecute a practice "of any * * * deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or omission of any material fact. * * *." See N.J.S.A. 56:8-2. In Kugler v. Romain, 58 N.J. 522 (1971), the court indicated the desirability and necessity of interpreting the concept of fraud liberally so as to effectuate the public purpose. There the Court (at p. 543) quoted with approval from Kerr, Fraud and Mistake, 1 (7th Ed. (1952)), who wrote as follows:
*233 The Courts have always avoided hampering themselves by defining or laying down as a general proposition what shall be held to constitute fraud. Fraud is infinite in variety. The fertility of man's invention in devising new schemes of fraud is so great, that the courts have always declined to define it, or to define undue influence, which is one of its many varieties, reserving to themselves the liberty to deal with it under whatever form it may present itself. Fraud, in the contemplation of a Civil Court of Justice, may be said to include properly all acts, omissions, and concealments which involve a breach of legal or equitable duty, trust or confidence, justly reposed, and are injurious to another, or by which an undue or unconscientious advantage is taken of another. All surprise, trick, cunning, dissembling and other unfair way that is used to cheat anyone is considered as fraud.
I conclude that a referral or pyramid sales practice is prohibited by our Consumer Fraud Act.
Defendants argue that its program is not analogous to the traditional referral scheme because it avoids the endless chain aspect of such schemes by virtue of a company-imposed quota. They further contend that disclosure was made at Golden Opportunity meetings as to the number of distributorships sold and the number still available in New Jersey.
Defendants produced testimony that, based on a survey and report, Koscot limited the number of distributorships in New Jersey to 1,011 on the ratio of 1 to 7,000 residents. While there was testimony that at times a statement was made at Golden Opportunity meetings that Koscot had limited the number of distributorships available in each State, and this appeared in one of its manuals, the specifics as to the number sold and number still available were stated, if at all, in a vague way. Questions as to numbers were evaded. In reality there were no specifics. In short, no substantial or meaningful effort was made to inform prospective investors of the exact status of the distributorship quota at any particular point in time. One prospect, told that he could triple his income with the same effort he was then exerting in his work, bought a distributorship in December 1970, only weeks before Koscot abruptly stopped all such *234 sales on February 3, 1971. The halt came with no prior notice. When distributors assembled in response to telegrams they were told the State was now closed.
The imposition of a quota was illusory. Not only did the quota fail to obviate the vice of market saturation, but it had a potential for inducing purchases of distributorships. As to the first aspect, it is to be remembered that distributorships are not exclusive as to territory. According to Dr. Westing, there is a strong tendency in such a case for the company to attract a substantial number of distributors in a given territory because each will recruit the people he knows best or with whom he comes in contact. Beauty Advisors, the potential source of retail income, too, would compete with one another in the same area and for the same ultimate consumers. The effect is to bring about an undue concentration of distributors in particular areas and to make the sales more difficult. The quota does not change the situation materially. Although it applies to the entire state the tendency is for distributors to bring in others in their immediate vicinity. This can lead to a gross overexpansion of a marketing plan in one community even before the state quota has been reached. Hence it is not an effective control in a narrow geographical area. The chain process is initiated when the first sales have been made and the law of diminishing returns then begins to operate against late participants.
As to the second aspect of the quota, statements that there were a limited number of distributorships available had the tendency of making them more desirable and inducing quicker affirmative responses in those to whom the promise of large incomes had been glowingly made. They were unaware of the pitfalls of market saturation. The State, in such cases, "has a vital interest in the protection of its citizens from fraud and, in fact, from the consequences of their own ignorance or folly in not recognizing that sooner or later, usually sooner, the market will become saturated and no one interested in purchasing the product or service proffered will remain." See Commonwealth of Virginia v. *235 Dare To Be Great, Inc., Glenn W. Turner, et al, an unreported opinion of the Circuit Court of Virginia, 1971.
I conclude that the quota did not, on the evidence here presented, save Koscot's wholesale marketing program from the vice of pyramid sales. Cf. Florida Discount Centers, Inc. v. Antinori, 226 So.2d 693, 694 (Fla. Dist. Ct. of App., 1969), aff'd 232 So.2d 17 (Supreme Ct., 1970).
I find that the presentations at the Golden Opportunity meetings and GO Tours were fraught with misrepresentations, unsubstantiated or false statements and concealments of fact, the details of all of which are set out above. They were designed and calculated, with the aid of the contrived manner in which the meetings and tours were conducted, to inveigle not only the gullible but the skeptical as well to purchase distributorships. I conclude that they constituted unlawful practices in violation of section 2 of the Consumer Fraud Act, N.J.S.A. 56:8-2.
Defendants contend that the Attorney General was not entitled to bring this action because there is not present here the elements of law or fact common to all members of the class he is said to represent, and furthermore, that the procedure is deficient in that notice of the action was not given in accordance with R. 4:32-2(b).
The Attorney General has alleged that defendants have practiced deception and committed other acts against a large class of persons in violation of N.J.S.A. 56:8-2. The means employed in inducing the purchase of distributorships were the same in all cases, there having been approximately 500 Golden Opportunity meetings in New Jersey and innumerable GO Tours and business training sessions. While undoubtedly there were some variations at the meetings, the plan and format were the same. As the court said in Kugler v. Romain, supra, at pp. 557-558:
The Legislature, by N.J.S.A. 56:8-8, clearly empowered the Attorney General to police consumer practices and contracts. Section 8 authorized him to obtain an injunction against a seller who in marketing his products uses deception, fraud, false pretense, misrepresentation *236 or concealment of material facts in violation of N.J.S.A. 56:8-2. And this remedy is available even though no consumer has in fact been misled or damaged thereby. * * * That the Legislature intended to confer on the Attorney General the broadest kind of power to act in the interest of the consumer public is indicated not only by the quoted language but also by the acts establishing the Office of Consumer Protection. Under the latter statute all of the functions, powers and duties of the Attorney General derived from the Consumer Fraud Act as set out in N.J.S.A. 56:8-2 and 8 are directed to be exercised by him through the Office of Consumer Protection. N.J.S.A. 52:17B-5.7. * * * Consequently there is a tremendous need to find a simple, inexpensive solution which will accomplish the greatest possible good for the greatest possible number of consumers who have common problems and complaints vis-a-vis the seller.
The purchasers of distributorships are an ascertainable class of victims with a sufficient community of interest to justify this action by the Attorney General. See Kugler at p. 541. In Riley v. New Rapids Carpet Center, 61 N.J. 218 (1972), the Supreme Court said that our Consumer Fraud Act authorizes the Attorney General to sue for a class of victims and to restrain further depredations. While it is true that R. 4:32-2 provides that in a class action notice shall be given to members of the class, there is no direction requiring the Attorney General to give such notice when he commences an action. In Kugler v. Romain, the court said at p. 539 that the suit was "in the nature of a class action." It saw no need to pass upon the procedural aspects of the case. I see no necessity for requiring early notice in this case, since the Attorney General sues on behalf of named distributors and all other consumers who have purchased distributorships. Even if such notice was required, it does not affect the validity of the proceeding. Appropriate notice to distributors will be given to them under the terms of the judgment which will be entered in this case.

II.
The Attorney General alleges that certain retail aspects of Koscot's marketing plan violate this State's Antitrust Act, *237 N.J.S.A. 56:9-1 et seq. Specifically he contends that by the imposition by Koscot upon its Distributors and Supervisors of restrictive rules and regulations in its contracts and manuals, Koscot has created a marketing plan which violates section 3 of the Act. That section declares that:
Every contract, combination in the form of trust or otherwise, or conspiracy in restraint of trade or commerce, in this State, shall be unlawful.
Plaintiff also contends that by creating price discriminations, discounts, overrides, rebates, and finder's fees, Koscot has created a marketing plan, the effect of which is to eliminate Supervisors from retail competition with Distributors, in violation of section 4(a) of the Act. That section provides as follows:
It shall be unlawful for any person to monopolize or attempt to monopolize, or to combine or conspire with any person or persons, to monopolize trade or commerce in any relevant market within this State.
The relief sought in the complaint by the Attorney General for Koscot's alleged violations of the Antitrust Act was an injunction against the continuation of Koscot's retail business, pursuant to N.J.S.A. 56:9-10(a) which authorizes injunctive relief in antitrust suits, and a penalty of $100,000 against each defendant pursuant to N.J.S.A. 56:9-10(c). The request for injunctive relief has been modified. Plaintiff now seeks only the elimination of those retail aspects of Koscot's marketing plan which the Court finds to be violative of the Antitrust Act and the reformation of that plan to bring it into conformity with the Act.
Several preliminary observations regarding the statute are in order at this point. First it is to be noted that the Act itself provides a guide for construction. N.J.S.A. 56:9-18 states:
*238 This act shall be construed in harmony with ruling judicial interpretations of comparable Federal antitrust statutes and to effectuate, insofar as practicable, a uniformity in the laws of those states which enact it.
It is clear that sections 3 and 4(a), the two sections of the act upon which the Attorney General relies, were modeled after sections 1 and 2 of the Sherman Act, 15 U.S.C.A. § 1, 2.[7] In a case decided under the New Jersey Act, Oates v. East Bergen City Multiple Listing Service, Inc., 113 N.J. Super. 371, 383 (Ch. Div. 1971), the court applied the federal illegal per se doctrine to "concerted refusals to deal." In Grillo v. Board of Realtors of the Plainfield Area, 91 N.J. Super. 202, 219 (Ch. Div. 1966), a case decided prior to the passage of the Act and which involved allegations of common law restraint of trade, the court considered the federal decisions under the Sherman Act to be a "useful guide" and applied the illegal per se doctrine to "concerted refusals to deal." Thus it is apparent that the federal decisions interpreting sections 1 and 2 of the Sherman Act provide this court with guidelines for interpreting similar sections of the New Jersey Act.
This Act became effective on May 21, 1970, which was subsequent to the commencement of the operation of the rules and regulations which are brought into question in this case. The Attorney General has not alleged the existence of an unreasonable restraint of trade at common law; he seeks relief predicated solely on alleged violations of the Act committed after its effective date. He contends, correctly, in my view, that a continuing contract, legal at the *239 time it was entered into, violates a law proscribing its terms and effect if it continues in force after the passage of the law. Oates, supra, 113 N.J. Super. at p. 374; see also United States v. Trans-Missouri Freight Association, 166 U.S. 290, 342, 17 S.Ct. 540, 41 L.Ed. 1007 (1896), an early case under the Sherman Act.
The rules and regulations which are the subject of this complaint are found in the application for a distributorship, which became a contract upon its acceptance by Koscot and in the various editions of the Distributor's and Director's business manuals which were in use before and after May 21, 1970. The genuineness of these exhibits is either admitted or not in dispute. Although the precise periods of use of each of the manuals is open to some question and the language of successive manuals was changed in some minor respects, there is no doubt that the rules and regulations were and have been in effect before and ever since May 21, 1970. Furthermore, such minor changes as were made do not alter the substance of the rules and regulations and do not bear on their lawfulness.
The rules and regulations which are implicated in this inquiry may be placed initially in three categories: (1) Those which deal with the effect and significance of the rules themselves; (2) those which deal with the nature of the relationship between Koscot and the distributors; and (3) those which deal with the substantive manner in which distributors must conduct their business.
In the first category, the distributorship application provides that the distributor agrees to uphold and abide by all rules and regulations of Koscot as are from time to time adopted by it and set forth in its then current Koscot manuals. A similar rule appears in each version of the business manual. The effect of this is reinforced by another rule found in the business manual which provides that "Distributor understands that a violation of any company rule or regulation is reason for immediate termination of his status as a Distributor by the company Board of Directors."
*240 In the second category, the Distributor agrees always to indicate his status as an independent contractor and never to state or represent that he is an employee or agent of Koscot. He also agrees not to enter business transactions which would obligate Koscot and he is bound to assume responsibility for delivery of the merchandise and collection of the price. Finally, he agrees "that all purchases of merchandise from the company or his sponsor constitute a non-refundable sale."
The third category contains the following rules and regulations governing the manner in which a distributor must operate his business. He agrees to purchase goods only from Koscot or his sponsor and not to transfer to another organization without the prior written consent of Koscot and all Distributors above him in his organization. He may not have a financial interest in or be part of two separate distributorships nor may he make any agreement to divide profits, assets or new recruits. His retail sales outlets are limited to home service routes and beauty forums or shows unless he receives Koscot's prior approval for other outlets such as beauty salons, barber shops and health studios. All advertising and promotion of Koscot products by distributors is subject to prior written approval from Koscot. All retail sales are to be made at the suggested retail prices.
It is the Attorney General's position that the existence and effect of these restrictive rules and regulations, when considered as a whole, constitute unlawful "vertical" restraints per se or in the alternative constitute unreasonable "vertical" restraints of trade and commerce upon the retail distribution of Koscot products in New Jersey. "Vertical" restraints are those which emanate entirely from one level of distribution, e.g., a manufacturer, to lower levels of distribution, such as wholesalers and retailers. They are distinguishable from "horizontal" restraints which arise among or between competitors at the same level of distribution.
It is important to note that the Attorney General is not concerned with the impact of the rules in question upon *241 "interbrand" competition among various companies for the total market for home use cosmetics. The evidence shows that Koscot has about a 1% share of this market. Agreements inter sese between Koscot and its distributors obviously have only a de minimis effect on the market with this limited degree of market penetration. The attack is directed against the "intrabrand" competition among the distributors of Koscot products in New Jersey.
In construing § 1 of the Sherman Act, Justice Brandeis noted that "every agreement concerning trade, every regulation of trade, restrains. To bind, to restrain is of their very essence." Chicago Board of Trade v. United States, 246 U.S. 231, 238, 38 S.Ct. 242, 244, 62 L.Ed. 683, 687 (1918). If applied literally, section 1 of the Sherman Act would prohibit all contracts which might, in some insignificant degree or attenuated sense, restrain trade or competition. In the recent case of United States v. Topco Associates, Inc., 405 U.S. 596, 606, 92 S.Ct. 1126, 1133, 31 L.Ed.2d 515, 525 (1972)[8] the court briefly discussed the development of alternatives to such a literal interpretation.
In lieu of the narrowest possible reading of § 1, the Court adopted a "rule of reason" analysis for determining whether most business combinations or contracts violate the prohibitions of the Sherman Act.
Standard Oil Co. v. United States, 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619 (1911). An analysis of the reasonableness of particular restraints includes consideration of the facts peculiar to the business in which the restraint is applied, the nature of the restraint and its effects, and the history of the restraint and the reasons for its adoption. Chicago Board of Trade v. United States, supra, 246 U.S. at 238, 38 S.Ct. at 243 [62 L.Ed. at 687].
*242 While the Court has utilized the "rule of reason" in evaluating the legality of most restraints alleged to be violative of the Sherman Act, it has also developed the doctrine that certain business relationships are per se violations of the Act without regard to a consideration of their reasonableness. In Northern Pacific R. Co. v. United States, 356 U.S. 1, 5, 78 S.Ct. 514, 518, 2 L.Ed.2d 545, 549 (1958), Mr. Justice Black explained the appropriateness of, and the need for, per se rules:
[T]here are certain agreements or practices which because of their pernicious effect on competition and lack of any redeeming virtue are conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use. This principle of per se unreasonableness not only makes the type of restraints which are proscribed by the Sherman Act more certain to the benefit of everyone concerned, but it also avoids the necessity for an incredibly complicated and prolonged economic investigation into the entire history of the industry involved, as well as related industries, in an effort to determine at large whether a particular restraint has been unreasonable  an inquiry so often wholly fruitless when undertaken.
In support of its allegation of per se unlawful restraints, the Attorney General relies heavily on United States v. Arnold, Schwinn and Co., 388 U.S. 365, 87 S.Ct. 1856, 18 L.Ed.2d 1249 (1967) in which vertical restrictions on the distribution of bicycles produced by a major, but not dominant, manufacturer came under attack.[9] Although at trial much attention was given to the interbrand effect of alleged price-fixing, in the Supreme Court attention was directed solely to the "intrabrand effect of the contested restrictions." 388 U.S. at 369, 87 S.Ct. at 1860, 18 L.Ed.2d at 1255.
The marketing methods challenged in Schwinn were of three basic types: (1) sales directly to distributors; (2) sales to independent retailers by means of consignment or agency arrangements with distributors; and (3) sales to retailers under the so-called Schwinn Plan involving direct shipments by Schwinn to the retailer, with Schwinn invoicing these retailers, extending credit and paying a commission *243 to the distributor taking the order. Under these plans each of the 22 distributors had an exclusive territory in which to sell and each was limited to his territory. Each franchised retailer was limited to a designated location or locations. Each franchised dealer could purchase only from or through the authorized distributor in his area and could sell only to the ultimate retail purchaser and not to any unfranchised retailer or discount house.
The District Court held that in "transactions in which the distributor purchased the bicycles from Schwinn for resale, as distinguished from sales by the distributor as agent or consignee of Schwinn or on the Schwinn Plan," 388 U.S. at 371, 87 S.Ct. at 1861, 18 L.Ed.2d at 1256, Schwinn had committed a per se violation. It refused to declare invalid those restrictions on retailers which limited their right to re-sell bicycles purchased by them.
In the Supreme Court the Government urged that agreements requiring distributors to limit their distribution to only such retailers as are franchised should be enjoined.[10]
The Supreme Court agreed and modified the decision below. The Court stated, 388 U.S. at 378, 87 S.Ct. at 1865, 18 L.Ed.2d at p. 1259: *244 the decree should be revised to enjoin any limitation upon the freedom of distributors to dispose of Schwinn products, which they have bought from Schwinn, where and to whomever they choose. The principle is, of course, equally applicable to sales to retailers upon any condition, agreement or understanding limiting the retailer's freedom as to where and to whom it will resell the products.
Although the Supreme Court made it clear that certain issues before it were being decided by the test of "reasonableness," it is equally clear that this issue, that of a manufacturer's control after parting with both risk and title over his product, was decided under the per se test.
As the District held, where a manufacturer sells products to his distributor subject to territorial restrictions upon resale, a per se violation of the Sherman Act results. And, as we have held, the same principle applies to restrictions of outlets with which the distributors may deal and to restraints upon retailers to whom the goods are sold. Under the Sherman Act, it is unreasonable without more for a manufacturer to seek to restrict and confine areas or persons with whom an article may be traded after the manufacturer has parted with dominion over it. (citing cases). Such restraints are so obviously destructive of competition that their mere existence is enough. 388 U.S. at 379, 87 S.Ct. at 1865, 18 L.Ed.2d at p. 1260.
Again, in the penultimate paragraph of its opinion, the Court said, 388 U.S. at p. 382, 87 S.Ct. at p. 1867, 18 L.Ed.2d at p. 1262:
Once the manufacturer has parted with title and risk, he has parted with dominion over the product, and his effort thereafter to restrict territory or persons to whom the product may be transferred  whether by explicit agreement or by silent combination or understanding with his vendee  is a per se violation of § 1 of the Sherman Act.
One other matter in Schwinn is worthy of note. Although there was no finding that Schwinn ever terminated a distributorship or retail franchise because of a breach of the regulations there in question, it was sufficient to show that Schwinn was "firm and resolute" by showing a "communicated danger of termination." Id. 388 U.S. 3658, 87 S.Ct. 1856, 18 L.Ed.2d at p. 1256.
*245 Two recent lower federal court decisions have differed over the application of the Schwinn doctrine. In United States v. Glaxo Group Limited, 302 F. Supp. 1 (Dist. of Col. 1969), the Court applied the per se rule to prohibit a prescription drug manufacturer from compelling approval before a licensee-distributor could resell its products, even though this restraint was based on the "laudable" motive to insure "uniform standards of health and safety in the preparation of a final product throughout the world." Id. at 9. In view of the Schwinn rule, the Court held that it "may not consider the reasonableness of the restriction or its business justification in mitigation of illegality." In contrast with this case is Tripoli Company v. Wella Corp., 425 F.2d 932 (3 Cir. 1970), cert. den. 400 U.S. 831, 91 S.Ct. 62, 27 L.Ed.2d 62 (1970), in which the Court upheld on the ground of reasonableness, certain restraints on the distribution of beauty and barber supplies intended for professional use. The Court there considered the extenuating circumstances of sales of these products to persons other than trained professionals. In reaching the conclusion that Schwinn permits a test of reasonableness, the Court, at p. 936, construed that portion of the Schwinn opinion which states that:
Under the Sherman Act, it is unreasonable without more for a manufacturer to seek to restrict and confine areas or persons with whom an article may be traded after the manufacturer has parted with dominion over it. (Emphasis added by the Court of Appeals.)
The Court concluded that "here there is more", Id. at p. 936, i.e., a danger to non-professional users.[11] Regardless of whether or not the Court in Tripoli was correct in its narrow reading of Schwinn (a questionable matter in view of *246 the Supreme Court's statement near the end of its opinion in Schwinn, quoted above), "more" is not presented by Koscot. I am of the opinion that Koscot's rules and regulations must be tested by the per se rule of Schwinn.
In applying this test, it is necessary first to examine the relationship of the parties and the nature of their transactions. I find that the status of the Distributors and Supervisors, in their capacity as sellers of Koscot cosmetic products (as distinguished from their capacity as sellers of Koscot distributorships) is clearly that of independent contractors and not that of agent or employee. The company rules are clear. By the distributorship application drawn by Koscot, each distributor agreed that this was to be his status. Furthermore, the business manual rules bind each distributor always to indicate his status as an independent contractor and never as that of agent or employee. Additionally, other rules and practices support this formal relationship and also support the conclusion that the transactions were such as to transfer title and risk to the distributor, within the meaning of Schwinn, supra. As already noted, one rule provides that "all purchases of merchandise * * * constitute a non-refundable sale." By another the distributors agreed to assume responsibility for delivery of merchandise to the ultimate consumer and for the collection of the price from that consumer. Finally, although not urged by plaintiff, the admitted practice of charging a 5% monthly fee for inventory stored in Koscot's Satellite Distribution Centers seems consistent with the notion that as a result of the transactions between Koscot and its distributors, title and risk of loss had passed to the distributors.
Next, as in Schwinn, although there is no proof that any distributorships were actually terminated because of a violation of Koscot's rules, its firmness and resoluteness are "grounded upon the communicated danger of termination" by virtue of a rule in the business manual calling for "immediate" termination for breach of the rules.
*247 Finally, with regard to the effect of the rules and regulations, I find several of them indistinguishable in substance from some prohibited in Schwinn and certain others to be violative of the spirit of the Schwinn decision and hence per se violations of our Antitrust Act. First, the rule which binds each distributor and supervisor to buy only from his sponsor is in fact a restriction on all other Koscot distributors which prohibits them from selling products to distributors outside of their respective "organizations." Secondly, the rule which binds each distributor to limit his retail outlets to certain specified ones, unless he gets Koscot's approval, clearly limits his opportunity to sell to whomever and wherever he chooses. Finally, those rules which restrict his right to advertise and promote Koscot products, those which prohibit the transfer of a distributor to another organization, and those which prevent him from associating co-operatively with other distributors, all restrain the individual from competing as effectively as he, individually otherwise could. As the Court said in Topco, supra, at p. 610 of 405 U.S., at p. 1134 of 92 S.Ct., at p. 527 of 31 L.Ed.2d, in discussing the reason for the application of per se rules to certain restraints (albeit, horizontal, in that case):
In applying these rigid rules, the Court has consistently rejected the notion that naked restraints of trade are to be tolerated because they are well-intended or because they are allegedly developed to increase competition. (citing cases)
Antitrust laws in general, and the Sherman Act in particular, are the Magna Charta of free enterprise. They are as important to the preservation of economic freedom and our free enterprise system as the Bill of Rights is to the protection of our fundamental personal freedoms. And the freedom guaranteed each and every business, no matter how small, is the freedom to compete  to assert with vigor, imagination, devotion, and ingenuity whatever economic muscle it can muster. Implicit in such freedom is the notion that it cannot be foreclosed with respect to one sector of the economy because certain private citizens or groups believe that such foreclosure might promote greater competition in a more important sector of the economy. Cf. United States v. Philadelphia National Bank, 374 U.S. 321, 371, 83 S.Ct. 1715, 10 L.Ed.2d 915, 949 (1963). (Emphasis added)
*248 I find that Koscot's rules and regulations, insofar as they restrict or limit (1) the persons from whom and to whom distributors may purchase and sell Koscot products, (2) the manner and method by which they may sell or advertise their product, and (3) the right of distributors to associate and cooperate with other distributors in a retail sales effort, constitute a per se unlawful restraint of trade and commerce upon the retail distribution of Koscot products in New Jersey in violation of section 3 of the Antitrust Act. In view of this finding it is unnecessary to consider the rules under the "rule of reason" doctrine.
Plaintiff also contends that the different discounts given to Distributors (65%) and Supervisors (55%), combined with the overrides given to Distributors on sales by Supervisors and the fixing of retail prices, are discriminatory, have a tendency to substantially lessen or eliminate competition between these two classes, and tend to force out Supervisors and create a monopoly class of wholesalers of Koscot products in violation of N.J.S.A. 56:9-4(a).
Plaintiff's argument runs as follows: Distributors and Supervisors may compete with each other by selling products at retail through Beauty Advisors. When a Distributor sells directly through a Beauty Advisor, she receives a 40% commission, the Distributor spends 35% to replenish inventory as required, and 5% for inventory storage. He thus retains 20% as profit minus any other operating expenses.
In contrast with this, when a Supervisor sells through a Beauty Advisor, she receives the same 40%, the Supervisor must spend 45% to replenish inventory and 5% for inventory storage. He thus retains 10% as profit minus any other expenses. On each of these sales, the Distributor receives an override of 10%.
As a consequence of these differences, for example, on a retail sales volume of $20,000 made by Beauty Advisors of a Distributor and a like amount made by Beauty Advisors of a Supervisor, there will be a substantial difference in net *249 profit. A Distributor will net $6,000 ($4,000 direct net profit and $2,000 override). His Supervisor, on the other hand will net only $2,000.
When the other operating expenses are taken into account for both Distributors and Supervisors, it is alleged that the profit to the Supervisor becomes so small as to make it virtually untenable for the Supervisors to compete in the retail market through Beauty Advisors and hence Supervisors must either drop out of that market or invest an additional $3,000 to become Distributors and obtain the favored marketing position.
In support of this position, plaintiff has offered no proof, other than the undisputed rules and price and rebate structure. Nor has he cited any apposite cases to show that such price differences as exist here are per se monopolistic or tend toward the creation of a monopoly. In the one case cited by him, Klor's v. Broadway-Hale Stores, 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959), both concerted refusals to deal and price discriminations by ten major appliance manufacturers were involved. In reversing the dismissal of the action by the District Court, the Supreme Court noted that the Sherman Act prohibits not only those combinations which actually create or attempt to create a monopoly, but also those which "tend to create a monopoly." 359 U.S. at 213, 79 S.Ct. at 710, 3 L.Ed.2d at 745. The Court remanded the matter to the District Court for trial on the merits of that issue.
On the basis of the proofs before this court, I do not find that the price differentials and overrides tend to create a monopoly in the Distributors or substantially lessen competition. The evidence shows that of the 1,011 distributorships sold, 624 were to Supervisors and 387 were to Distributors. No evidence was offered to show the relative number of each class who are still active in retail sales or to show that it was the alleged inability of Supervisors to compete in retail sales that caused former Supervisors to become Distributors. There is no evidence that the discount differential *250 did in fact tend to lessen competition, tend to create or contribute to the creation of a monopoly or that a monopoly does in fact exist.
Section 10(a) of the Antitrust Act provides that one who violates the Act shall, in addition to injunctive relief, be "liable to a penalty of not more than the greater of $100,000 or $500 per day for each and every day of said violation."
The Attorney General saying that he sees no reason to calculate days in order to determine the penalty he is seeking, asks for the imposition of "the $100,000 mandatory minimum penalty, to be levied against each of the defendants * * *." I do not read the statute to mean that in a case such as this, the minimum penalty is $100,000. I construe it to mean that the maximum penalty cannot exceed $100,000 or $500 per day, whichever is greater. The imposition of lesser penalties is reserved to the discretion of the court. In view of the fact that the Act came into effect after Koscot embarked on its program and upon considering the nature of the violations, I am of the opinion that a penalty of $25,000 is appropriate for the infractions.

III.
N.J.S.A. 14A:13-3 prohibits a foreign corporation from transacting business in this State until it shall have procured a certificate of authority to do so from the Secretary of State. Plaintiff contends and Koscot concedes that it transacted business in New Jersey in 1969 without having obtained the required certificate of authority to do so. The penalty for such a violation is not less than $200 nor more than $1,000 for each calendar year to be recovered in an action prosecuted by the Attorney General. Because Koscot began to transact business in this State in early 1969 and its business was extensive, the court imposes a penalty of $1,000 for the transgression.

*251 IV.

Plaintiff seeks to hold Glenn W. Turner equally liable with Koscot for the unlawful practices under the Consumer Fraud Act and for violations of the New Jersey Antitrust Act.
Turner founded Koscot in 1967. He, his wife and an attorney were its incorporators. Since 1967 he has owned 95 shares of its stock; the remaining 5 shares are and have been owned by his wife. During the entire period of Koscot's activities in New Jersey which are involved in this action, he has been chairman of its board of directors. There was evidence that a voting trust was created in 1970 for Turner's sole benefit, the purpose of which was to enable the trustees to make financial decisions. Turner acted in an advisory capacity. No copy of the trust agreement was offered in evidence and its scope and effect were not revealed at the trial. There also was evidence that the trust was dissolved in early 1971. Although there was testimony that Turner resigned as chairman of the board during the final hearing, he is continuing to act as an advisor.
He has identified himself with Koscot as completely and fully as one can and does as the proprietor of a business. The Distributor's Training Manual, which served as a script for Golden Opportunity meetings, opens with "A Message To My Distributors From Glenn W. Turner," as does the Directors Training Manual. Both contain "a message" from Turner which are virtually identical with each other.[12]
*252 Turner's ownership of and identity with Koscot are included in a description of his life and success which is part of the Distributor's Training Manual and of the Distributor's Business Manual, which has also served as a script for Golden Opportunity Meetings.[13] The sketch creates the impression that Koscot is Turner's company and that its success is the direct result of his efforts, guidance and direction.
He permitted a member of his organization to tell at a Golden Opportunity meeting of his progression from share-cropper to multi-milionaire, to speak of his combined and corporate wealth and to say that Koscot was the basis of Turner's fortune.
Turner has been active in Koscot's activities. He appointed men to various positions and gave promotions to others. He attended a number of Golden Opportunity meetings in New Jersey. He concluded one with a pep talk and *253 at another said people had earned more than $50,000. He spoke at Florida meetings to New Jersey residents when they journeyed there on GO Tours. At at least one of the meetings he repeated the earnings figures which were stated at Golden Opportunity meetings in New Jersey. At another he said that everyone could easily become millionaires. He remained at that meeting when an official of the company known as the master closer put down figures on a board of $500 to $250,000 which he said could be earned by selling franchises.
Thus, not only did Turner merge his identity with Koscot, but he authorized conductors of Golden Opportunity meetings to follow scripts in which his messages and biographical sketch appeared and which contained the misrepresentations and exaggerations which the conductors verbally paraded at the meetings. The inference is inescapable that he gave his name, lent his presence and publicized his success story to induce prospects who attended the meetings to believe in the representations. He also personally made false statements of earnings. Since he owned 95% of the outstanding stock of Koscot and his wife owned the remaining 5%, the moneys earned by Koscot by means of unlawful practices were clearly for his benefit.
While it is fundamental that a corporation is an entity wholly separate and distinct from the individuals *254 who compose and control it, Jackson v. Hooper, 76 N.J. Eq. 592 (E. & A. 1909), and that the entity may not as a general rule be disregarded, Fortugno v. Hudson Manure Co., 51 N.J. Super. 482, 500 (App. Div. 1958), the principle is not without its exceptions. In Whitfield v. Kern, 122 N.J. Eq. 332, at p. 347 (E. & A. 1937), the Court said:
In fine, the conception of a legal entity distinct from the persons composing the corporation is to be disregarded, in equity, in cases not within the reason and policy of this legal fiction, * * *.
Equity will go behind the corporate form where necessary to do justice. Fortugno, at p. 501.
Where the corporate form is used by individuals for the purpose of evading the law, or for the perpetuation of fraud, the courts will not permit the legal entity to be interposed so as to defeat justice. Trachman v. Trugman, 117 N.J. Eq. 167, 170 (Ch. 1934).
He who seeks to have the court apply the exception to the rule rather than "the fundamental principle" that a corporation is a separate entity has the burden of proof and must demonstrate the misuse of the corporate form and the necessity *255 of disregarding it to do equity. Schmid v. First Camden National Bank & Trust Company, 130 N.J. Eq. 254, 261 (Ch. 1941). Plaintiff here has carried that burden. He has demonstrated that Koscot is the alter ego of Turner and that Turner, for his financial gain, utilized Koscot to engage in unlawful practices proscribed by the Consumer Fraud Act. Hence, the fact that Koscot is a corporate entity does not immunize Turner from being held to account for Consumer Fraud Act violations committed on his behalf.
Turner is liable for his improper acts even if he had not merged his identity with Koscot and the corporate entity is not disregarded.
It has been said that
It is thoroughly well settled that a man is personally liable for all torts committed by him, consisting in misfeasance  as fraud, conversion, acts done negligently, etc.  notwithstanding he may have acted as the agent or under directions of another. And this is true to the full extent as to torts committed by the officers or agents of a corporation in the management of its affairs. The fact that the circumstances are such as to render the corporation liable *256 is altogether immaterial. The person injured may hold either liable, and generally he may hold both as joint tortfeasors. Corporate officers are liable for their torts, although committed when acting officially.

* * * * * * * *
A corporate officer or agent is personally liable for damages caused by his fraud or deceit, to the person directly injured thereby. In other words, an officer of a corporation, actively participating in the fraud practiced by it, cannot escape personal liability on the grounds that he was acting for the corporation, or that it alone was nominally the party to a contract procured by fraud. 3 Fletcher Cyclopedia of Corporations (Perm Ed.), §§ 1135, 1143, pp. 778, 800.
In Vreeland v. New Jersey Stone Company, 29 N.J. Eq. 188 (Ch. 1878), aff'd 29 N.J. Eq. 651 (E. & A. 1878), individual stockholders were held liable for their deceit. There, six individuals subscribed for shares of stock of a company when it was organized. Later, Vreeland successfully applied for permission to subscribe for shares. His subscription was obtained when one of the original subscribers made a false representation to Vreeland in the presence of the others. The six individuals, when sued, contended they were not personally liable, saying that a decree could only go against the corporation. In disagreeing with this contention, the Court said at p. 195:
Such relief [only against the Company] would, in this case, be manifestly inadequate. It would leave the fraud-doers simply convicted of fraud, but untouched by the legal consequences of their own acts. In Ross v. Estates Investment Co., L.R. (3 Eq. Cas.) 122, and in Kent v. Land and Brickmaking Co., L.R. (4 Eq. Cas.) 588, a decree was made against all the defendants for the sum fraudulently obtained. These cases, in my opinion, declare the correct rule. All who get gain by fraud must bear the legal consequences of the wrong *257 they do. When a fraud is committed in the name, and under cover of a corporation, by persons having the right to speak for it, for their personal gain and benefit, they are bound to answer personally for their wrongful acts. Their tongues uttered the false words and their purses should pay the damages. In this case the defendants constituted the whole proprietorship of the corporation, and they merely employed the corporate name the more effectually to accomplish their purposes against the complainant.
By authorizing Koscot to issue scripts containing false statements which formed the basis for fraudulent representations, Turner rendered himself liable for the deceit.
If the directors of a corporation make false and fraudulent regulations in a prospectus, report, or otherwise, and thereby induce the public to subscribe for or purchase shares of its stock, they are all equally liable in an action for deceit to any person who subscribes for or purchases shares in reliance on the representations, and is thereby injured. * * *
It is not necessary, however, that directors, sought to be held liable, personally make false representations to plaintiff, but it is sufficient that they approve thereof. Generally, it may be said that if directors even sanction false statements, prospectuses, reports, or certificates, they are liable. It is settled that a director who knowingly issues or sanctions the circulation of a false prospectus containing untrue statements of material facts, the natural tendency of which is to deceive and mislead the community and induce the public to purchase the stock, is responsible to those who are injured thereby. Id. §§ 1147, 1150, pp. 814, 826.
By reason of his activities and conduct Turner was part and parcel of Koscot's unlawful practices and is responsible with it for their consequences. Accordingly, judgment will go against him as well as against Koscot for his and their unlawful practices under the Consumer Fraud Act.
For the same reasons judgment will also go against him as well as against Koscot for the violations of the New Jersey Antitrust Act which I have found were committed by Koscot. This judgment against him and Koscot will be in the amount of $25,000 for which they will be jointly and severally liable.
Turner contends that process was improperly allowed and served upon him. He is and has been a resident of Florida. *258 Based on an affidavit by plaintiff's counsel made pursuant to R. 4:4-4(e) the Court authorized service of process on Turner by registered or certified mail. When Turner was thus served he filed an answer in which he did not assert the defenses of lack of jurisdiction over him or insufficiency of process. R. 4:6-2 provides that every defense shall be asserted in the answer, except that enumerated defenses which include (b) lack of jurisdiction over the person, and (c) insufficiency of process may, at the option of the pleader, be made by motion. R. 4:6-7 provides that defenses (b) and (c) in R. 4:6-2 are waived if not raised by motion pursuant to R. 4:6-3, which requires that defenses (b) and (c) shall be raised by motion within 90 days after service of the answer, provided that defense has been asserted therein.
Since the defense now asserted was not raised in the answer and not pressed by motion within time, it is deemed to have been waived, if in fact it ever existed.

V.
Section 8 of the Consumer Fraud Act authorizes a court to enjoin persons from engaging in or continuing practices proscribed by the Act or the doing of any acts in furtherance thereof. The court may also make such orders or judgments as may be necessary to restore to a person in interest any moneys which may have been acquired by means of such unlawful practice.
Section 10(a) of the Antitrust Act authorizes the court to prevent and restrain violations of the Act.
By reason of the findings and conclusions stated in this opinion the judgment to be entered will permanently enjoin defendants Koscot and Turner, their employees, agents, representatives and contract distributors 
1. From selling, or offering to sell, Koscot distributorships in New Jersey which authorize the owners to sell distributorships in any form to others;
*259 2. From authorizing others to make such sales;
3. From entering into contracts or agreements between Koscot and a new contract distributor;
4. From convening or conducting or authorizing others to convene or conduct Golden Opportunity meetings in New Jersey and from convening GO Tours, or other similar ventures within this State for the purpose of transporting residents of New Jersey to locations outside of this State;
5. From implementing and enforcing those provisions of Koscot's contracts and agreements with contract distributors which restrain trade or commerce in this State, particularly those provisions which
(a) restrict contract distributors as to those from whom they may purchase Koscot products and to those to whom they may sell such products;
(b) restrict the right of a contract distributor to advertise and promote both Koscot products and his distributorship;
(c) restrict the right of a contract distributor to make a consignment of merchandise to other distributors;
(d) restrict the right of a contract distributor to transfer to another organization;
(e) restrict the right of a contract distributor to have a financial interest in more than one Koscot distributorship at a time or to agree to a division of profits and assets with another organization.
The judgment will direct defendants to refund to all Koscot New Jersey Distributors and Supervisors and other contract distributors by whatever name called, who desire it, moneys paid by them to Koscot for their distributorships, less commissions received by such distributors as the result of selling distributorships. The judgment shall provide for appropriate notice to the distributors and for the method and time for filing claims for refund.
The judgment will also assess penalties against the defendants in the amounts stated in this opinion and direct their payment.
NOTES
[1] The breadth of this section was increased by P.L. 1971, c. 247, sec. 1.
[2] By P.L. 1971, c. 247, sec. 2, the powers of the Attorney General to enforce this statute were broadened.
[3] The sale of distributorships in this State abruptly came to an end in February 1971 under circumstances hereinafter related.
[4] It was expected that a Beauty Advisor would make many of her sales at parties arranged by her, at which she would assemble her friends and others for that purpose.
[5] As an underlying premise of a Beauty Advisor's earnings it was asserted that a family of 4 spends $17.82 each month for cosmetics. The proofs show that the average expenditure of such a family is between $10 and $11.
[6] His $100 plane fare was paid by his sponsor. He did not know a fee was involved until after he had signed a contract. It was only then that he learned he would have to pay a like fee for each of his prospects who were willing to go on a GO Tour.

Other costs and expenses were likewise not revealed or were not meaningfully disclosed at Golden Opportunity meetings and before a contract was signed. After entering the program, a 5% bookkeeping charge, a $25 participation fee, monthly distributor association dues and a charge against commissions for the use of Koscot's credit card service known as Servcot were imposed.
[7] Sections 1 and 2 of the Sherman Act provide in pertinent part as follows:

1. "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal."
2. "Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several states. * * *."
[8] There the Court considered a restriction imposed by Topco, a cooperative association of supermarket chains, which required under its bylaws that members could not sell any products supplied by the association at wholesale without first receiving special permission to do so. The Court agreed with the Government's contention that in part this amounted to a restriction on customers which was violative of the Sherman Act.
[9] At the time of the institution of the action, Schwinn apparently had 12.8% of the market.
[10] The Government argued "that it is illogical and inconsistent to forbid territorial limitations on resales by distributors where the distributor owns the goods, having bought them from Schwinn, and, at the same time, to exonerate arrangements which require distributors to confine resales of the goods they have bought to `franchised' retailers. It argues that requiring distributors, once they have purchased the product, to confine sales to franchised retailers is indistinguishable in law and principle from the division of territory which the decree condemns. Both, the Government argues, are in the nature of restraints upon alienation which are beyond the power of the manufacturer to impose upon its vendees and which, since the nature of the transaction includes an agreement, combination or understanding, are violations of § 1 of the Sherman Act." Id. 388 U.S. at 377, 87 S.Ct. at 1864, 18 L.Ed.2d at 1259.
[11] It might also be noted that in Tripoli there was less of a restriction than in the instant case. No territorial limitations were imposed nor was there any limitation of sales to franchised outlets. The only restriction was as to licensed barbers and beauticians because of the danger present.
[12] Dear New Director:

"As a Director in KOScot you have made the decision to become a member of the successful 5% of the nation's population. Let no obstacles keep you from reaching your goal and let no one affect your attitude.
As you know, a successful, positive attitude is your key to a successful life. If I had to choose one factor to which I attribute my success, it would be my attitude toward myself and my fellowman.
I would like to personally train each of you individually but, due to the enormous size of our company, this is not feasible. This Manual has been written for you. It contains the necessary information to enable you to become successful.
By following these instructions faithfully, you will become a success with KOScot. I made many mistakes as a Distributor as did many others before you. This manual was written to prevent you from making the same errors. Ignore the information contained here and you will have only yourself to blame for your failure.
I have been called a `Sharecropper on his way to harvest the world.' I sincerely want you to join me in my climb. Remember this, `a successful man is only an ordinary man who stayed on the job longer.'
Successfully yours, GLENN W. TURNER, Chairman of the Board."
[13] FOUNDER AND CHAIRMAN OF THE BOARD SHARECROPPER ON HIS WAY TO HARVEST THE WORLD
Glenn W. Turner has risen from the obscurity of a South Carolina tobacco farm to international fame because he found a new way to satisfy a universal human need.
It was a need that he felt early in life. His father was a sharecropper and the family never managed to earn more than $500 a year from the small plot of tobacco that they worked. As if this were not hardship enough, Glenn Turner was born with a speech impediment, a harelip, as an additional handicap.
Glenn went barefoot to school very often, and his studying had to be done between his farm chores. Because of his speech defect and his lack of proper clothing, he was subject to much ridicule and cruelty on the part of his classmates. His speech problem gave him so much trouble that he dropped out of school after eight years of formal education.
Until he was seventeen, Glenn worked with his father on the farm. His lack of essential comforts, however, filled him with a burning desire to achieve, to move on to better things. Despite his parents' admonitions to realize his place in life and be satisfied, he joined the Air force. While in the service, Glenn was faced even more with an awareness of the opportunities that existed beyond the confines of farm life. Following his service career, he returned to the farm.
Seeking for a new way to leave the farm, he took a sales job with a sewing machine company. Because of his speech impediment, he was paid no salary but was forced to work for commission only.
It was this financial pressure that enabled Glenn to develop his basic philosophy of life. In order to make sales, he had to gain the confidence of those he contacted. As he tried and failed, he began to realize that the people he met were much like him. Although they had no visible handicaps, they lacked self-confidence and were unable to make decisions.
Glenn then concerned himself more with his customers and their feelings. He began to satisfy their need for self-confidence. He became enthusiastic in his approach and his belief in his machines became contagious. From then on his sales soared. By giving his customers the recognition and attention that they needed, he became a success.
As he began to make strides forward financially, Glenn realized more and more that everyone needed encouragement, self-confidence, and personal attention. He learned that success was based upon treating people fairly. He tried to start his own sewing machine company but his lack of business experience caused him to fail three times before he finally made it pay. Then in 1966 he went into the cosmetic business as a Distributor. His ten years of experience in door-to-door sales finally paid off. In twelve short months, he used his phenomenal ability to earn $250,000 in cosmetics.
Realizing the potential in the cosmetic industry, Glenn formed his own cosmetic company in August 1967, KOSCOT INTERPLANETARY, INCORPORATED. During the first month, it grossed $67,000. It seemed to fluctuate from month to month until January, 1968, when the gross hit $158,000. From there it zoomed. In May, 1969, the monthly gross exceeded 4 million.
The sharecropper's son is now the owner of the fastest growing cosmetic firm in America. He built a $5,000 investment into a multimillion dollar cosmetic business operating in all 50 states, Canada and Puerto Rico in only 24 months.
To keep pace with the company's rapid growth, which averaged 32% increase in sales per month during the first year, Glenn started expanding and diversifying. In less than two years he controlled 25 corporations, ranging from a manufacturing plant to a professional football team.
Glenn Turner and his philosophy of life are now internationally known. He lectures several times a week and his private jet whisks him to speaking engagements the length and breadth of the North American continent.
He is responsible for the success of tens of thousands of individuals who have found a new way of life with his organization. His company has been termed a phenomenon of its time. Through his inspiration and encouragement many average people have gained unusual self-confidence, and have gone on to achieve outstanding business successes, using his ideas and the training that his company provides.
From obscurity and poverty to fame and fortune in less than two years: from a down and out handicapped farm boy to the sophisticated owner of the most unusual company of its kind; from an unknown nobody in a small country town to a man who is adored and respected by tens of thousands of followers. Glenn Turner discovered the secret of success when he realized that all anyone needs is inspiration and encouragement.
Glenn Turner is now realizing his dream of success. The beauty of it is, in his words, `that my success is made by sharing it with others.'"