JOHN V. R. VREELAND

*v.*

THE NEW JERSEY STONE COMPANY and others.

1. Contracts of subscription to the stock of a corporation, if procured by fraud, will be set aside.

2. The rule is universal, whatever fraud creates justice will destroy.

3. An oral contract of subscription will not be enforced under a charter requiring that such contracts shall be made in writing.

Vreeland *v.* N. J. Stone Co.

4. All who get gain by fraud must bear the legal consequences of their wrongful acts.

5. Where a fraud is committed in the name of a corporation, by persons having the right to speak for it, for their personal benefit, they will be made to answer personally for the injury inflicted by their fraud.

On final hearing on bill, supplemental bill, answer to supplemental bill, replication and proofs.

*Mr. J. S. Taylor*, for complainant.

*Mr. Jacob Weart*, for defendants.

THE VICE-CHANCELLOR.

This suit is brought against the New Jersey Stone Company and six natural persons. These six defendants, with the complainant, constitute all the proprietaries of the corporate defendant. Its object is to set aside the complainant's contract to take one hundred shares of the capital stock of the corporation, and also to recover the amount he has paid under it, on the ground that he was induced to enter into it by willful misrepresentation.

NOTE.—The general rule is well settled that a false and fraudulent representation, made by the agent of a corporation to a party at the time of his subscription to its stock, is a good defence in an action thereon. *Ang. & Ames on Corp.*, ¿ 531, *note (a)*; *Caszeaux* v. *Mali,* 25 *Barb.* (*N. Y.*) 578; *Cross* v. *Sackett,* 2 *Bosw.* (*N. Y.*) 617; *State* v. *Jefferson Turnpike Co.*, 3 *Humph.* (*Tenn.*) 305; *Davidson* v. *Tullock,* 3 *Macq. H. L. Cas.* 783, 6 *Jur.* (*N. S.*) 543; *Crump* v. *U. S. Mining Co.*, 7 *Gratt.* (*Va.*) 352; *Waldo* v. *Chicago, &c. R. R. Co.*, 14 *Wis.* 575; *New Sombrero Co.* v. *Erlanger, L. R.* (5 *Ch. Div.*) 73; *Eaglesfield* v. *Marquis of Londonderry, L. R.* (4 *Ch. Div.*) 693. See especially *Upton* v. *Englehart,* 3 *Dill. C. C.* 496, 506.

But such misrepresentation must be of a material fact, and shown by the defendant to have induced him to subscribe. *Vicksburg R. R.* v. *McKean,* 12 *La. An.* 638.

An unperformed promise to obtain subscriptions for the subscriber in another company, is no defence. *Crossman* v. *Penrose Co.*, 26 *Pa. St.* 69.

Nor a mistaken estimate as to the value of a contemplated improvement. *Ibid.*

Nor the holding out of flattering prospects by the agent. *Hughes* v. *Antietam Co.*, 34 *Md.* 317.

Vreeland v. N. J. Stone Co.

Contracts to take stock in a corporation stand upon the same footing as all other conventional obligations. If induced by fraud, they create no obligation, and the injured party has a right to have them abrogated.

The rule is universal, whatever fraud creates justice will destroy. For the general rule no authorities are necessary, but the following cases are cited to give instances of its application to the class of contracts under consideration: *Central R. R. Co. of Venezuela* v. *Kisch, L. R.* (2 *H. L.*) 99; *Smith's Case, L. R.* (2 *Ch. Ap.*) 604; *Kent* v. *Land and Brickmaking Co., L. R.* (4 *Eq. Cas.*) 588; *Ross* v. *Estates Investment Co., L. R.* (3 *Eq. Cas.*) 122, *S. C. on appeal, L. R.* (3 *Ch. Ap.*) 682; *Smith* v. *Reese River Co., L. R.* (2 *Eq. Cas.*) 264. The subjection of contracts of this kind to the rule above stated is thus plainly expressed by Lord Romilly, in the case first mentioned: "Contracts of this description between an individual and a company, so far as misrepresentation or suppression of the truth is concerned, are to be treated like the contracts between any two individuals. If one man makes a false statement which misleads another, the way in which that is to be treated affords the example for the way in which a contract is to be treated where a company makes a false statement which misleads an indi-

---

Nor that the company failed to acquire all of the land specified in its prospectus. *Kelsey* v. *Northern Light Co.*, 54 *Barb.* (*N. Y.*) 111.

Nor false and exaggerated statements as to the value of a donation of land made by congress to the company. *Walker* v. *Mobile R. R. Co.*, 34 *Miss.* 245.

Nor that the persons undertaking to construct a railroad were able to complete it out of their own resources without any advances from the company. *Andrews* v. *Ohio, &c. R. R. Co.*, 14 *Ind.* 169.

Nor that another corporation would do a certain act beneficial to the company. *Johnson* v. *Crawfordsville Co.*, 11 *Ind.* 280.

Nor as to the amount actually subscribed and paid in. *Mabey* v. *Adams*, 3 *Bosw.* (*N. Y.*) 346.

Nor that the stock is non-assessable beyond a certain percentage of its value. *Upton* v. *Tribilcok*, 1 *Otto* (*U. S.*) 45.

Nor as to the time within which the railroad would be completed. *Goodrich* v. *Reynolds*, 31 *Ill.* 490.

Nor that the agent will release the subscription. *Custar* v. *Titusville Co.*, 63 *Pa. St.* 381; *Saffold* v. *Barnes*, 39 *Miss.* 399.

Vreeland *v.* N. J. Stone Co.

vidual." And it has also been held, that if a person is induced, without fraud, to enter into a contract of this description by a promise, on behalf of the corporation, that it will aid him, in a specified mode, to pay his subscription, and the promise is not kept, his contract will not be enforced. *Burrows* v. *Smith*, 10 *N. Y.* 550; *Ang. & Ames on Corp.*, § 531.

Though the bill in this case proceeds upon the assumption that the complainant has entered into a valid contract, it appears no contract in writing was signed or made. The charter evidently intended the subscriptions to the stock should be made by writing only. The second section authorizes the incorporators to open books of subscription for capital stock (*P. L.* 1872, p. 749). Under a charter containing such a provision it has been held the contract must be in writing, and that a contract could not be established by parol evidence if a written contract had not been made. *Pittsburgh and Connelsville R. R. Co.* v. *Clarke*, 5 *Casey* 146; *Pittsburgh and S. R. R. Co.* v. *Gazzam*, 8 *Casey* 340. But under the case made here it must be assumed the contract is in legal form, and valid, unless infected with fraud.

The charter was approved March 22d, 1872, and an organization effected on the 9th day of May following. The cor-

---

The representation must be shown, if made at a public meeting, to have been authorized. *Buffalo R. R. Co.* v. *Dudley*, 14 *N. Y.* 336.

A party cannot discharge his liability if he himself was a party to the fraud. *Southern R. R. Co.* v. *Hixon*, 5 *Ind.* 165; *Custar* v. *Titusville Co.*, 63 *Pa. St.* 381; *Litchfield Bank* v. *Church*, 29 *Conn.* 137.

Notice of the discovery of the fraud, and of the party's rescission, must be given within a reasonable time, or it will operate as a waiver. *Cunningham* v. *Edgefield Co.*, 2 *Head.* (*Tenn.*) 23; *Upton* v. *Englehart*, 3 *Dill. C. C.* 496, 506; *Farrar* v. *Walker*, 13 *Nat. B'k Reg.* 82.

So, payment for the stock constitutes a waiver. *Ossipce Co.* v. *Canney*, 54 *N. H.* 295.

Such misrepresentations are no defence to an action for an unpaid installment brought by an insolvent assignee of the company. *Michener* v. *Payson*, 13 *Nat. B'k Reg.* 49; *Sanger* v. *Upton*, 1 *Otto* (*U. S.*) 56.

Or by a receiver. *Ruggles* v. *Brock*, 13 *Hun* (*N. Y.*) 164.

Or by a creditor. *Saffold* v. *Barnes*, 39 *Miss.* 399.

As to the mode of setting up such fraud, see *Goodrich* v. *Reynolds*, 31 *Ill.* 490; *Mabey* v. *Adams*, 3 *Bosw.* (*N. Y.*) 346.—Rep.

poration was created to quarry stone, prepare it for market and sell it. The capital stock was placed at $100,000, divided into one thousand shares of $100 each. Seven hundred shares were subscribed by the six defendants on the day of the organization, one of them subscribing for two hundred, and the other five taking one hundred each. Five directors were elected, and also a president, secretary and treasurer. On the same day the president and secretary were, by resolution, authorized to purchase of one of the directors—being the one who had just subscribed for two hundred shares of stock—"the lease of lands owned by him, at an expense of $35,000—the said lands consisting of two hundred acres, more or less, situated at Port Benjamin, Ulster county, New York." It quite clearly appears that the person of whom this purchase was authorized, had not, at that time, the slightest pretence of right to the possession of these lands, but it is claimed he held a written contract for a lease, and it also appears, if such a thing existed—it has not been put in evidence—it was made by a person who was not the owner of the land agreed to be demised.

No lease was executed until February 20th, 1873. Shortly prior to this date, the complainant had obtained information which caused him to believe that he had been defrauded, and to express dissatisfaction. On the 20th day of February, 1873, a lease was made by a person who was not the owner of the demised lands, to the person of whom the purchase of the lease was authorized, and, by an instrument bearing date on the same day, he sublet the demised premises to the corporation. The lease to the defendant granted a term of nine years and three months, and reserved a rent of $1,500, payable at the end of the term, and that to the corporation granted the same term, and reserved a rent of $35,000, payable also at the end of the term. The corporation acquired no right whatever, by a written instrument, to the possession of the demised premises, until February 20th, 1873; up to that date the person from whom it

derived its rights held no grant. On the 18th day of May, 1872, a call for fifty-two and one-half per cent. was made by the directors on the stockholders, and each of the six defendants is credited on the books of the company, as of that date, with a cash payment equal to the amount of his call. Fifty per cent., or $35,000 of the payment so credited, was not made at all. It is admitted, that instead of paying in cash the whole sum called, as represented by the books, each stockholder paid merely two and one-half per cent. in cash, and that fifty per cent. was credited to each as representing his share of the purchase-money of the lease. Under what circumstances, exactly, these credits were entered, the defendants are not agreed. The original lessee says the lease was a joint venture, in which he and the other five defendants were equally interested, yet it appears he was credited with $10,000 of its price, and each of the others with only five thousand dollars, while another defendant says he considered the credit to him was a donation from the lessee. On the 8th day of June, 1872, the complainant, at a meeting of the directors, applied for permission to subscribe for one hundred shares of stock. All the directors, as well as the single stockholder who held no official position, were present. Shortly before this, one of the defendants, who was a business acquaintance of the complainant, had told him that he and the other defendants were negotiating for a tract of land from which they expected to make a great deal of money; that they had a " big thing." The complainant expressed a desire to get an interest, and his friend promised to see what he could do for him. Subsequently this friend called several times for the complainant to go with him to a meeting of the directors, but he was always unable to go until the date last named. His application was opposed by two of the directors, who stated that they thought the unsubscribed stock ought to be retained for those already interested, and that, if a friend of one of the directors was permitted to subscribe, the same privilege ought to be granted to the friends of the other

directors; but, after some discussion, the application of the complainant was granted, by a vote of four to two, the stockholder who was not a director participating in the vote. On the 22d day of the same month of June, the complainant gave his note, at three months, for $5,250, in payment of the call of fifty-two and one-half per cent. on his stock, and subsequently paid it.

Three of the defendants distinctly admit that one of their number, speaking in the presence of the others, and without the slightest dissent being manifested by any of the defendants, openly represented to the complainant, just before the adoption of the resolution giving him permission to subscribe, that the corporation had purchased the lease for $35,000, and paid for it. This was pure fiction. Not a penny had been paid for it, and it was not intended that anything ever should be paid. It would be quite difficult, if not impossible, to invent a representation more thoroughly false in all its parts. It did not possess even the gloss of truth. No lease had been executed at this time, and I think there is strong reason to doubt even the existence of an available written contract for a lease. One of the defendants swears the fee of the lands to be demised was not worth over $2 an acre, and his estimate receives strong corroboration from the description given of them by other witnesses. No sensible man, in the prosecution of an honest enterprise, would agree to pay as rent, for a comparatively short time, three times the sum required to purchase the fee of the lands demised. The insincerity of the opposition to the complainant's subscription is painfully obvious; no one can doubt it was a mere fraudulent stratagem, artfully used, to stimulate his cupidity and stifle his caution. Two of the defendants pretended to be opposed to his application, but neither hinted that, if he was successful, his stock would cost him double what the other stockholders had paid for theirs, nor did they call his attention to the startling fact that they and the other defendants had realized on the sale of the lease the enormous profit of $33,500. One of them

says he withheld these important facts because he was not called upon to give them, and also because he did not consider it any of the complainant's business. But he was opposing the complainant's application, and, if his opposition was real and not counterfeit, he was called upon to do whatever would make his opposition successful. There can be no doubt he had it in his power to make his opposition quickly and decisively successful. An honest opposition would have availed itself of such easy means of certain success. The proofs furnished by the defendants show, incontestably, that the complainant's contract was procured by willful fraud. This entitles him to all the relief he asks, the abrogation of his contract and the return of the money he has paid under it.

But it is contended the six defendants are not personally liable, and that a decree can only go against the corporate defendant. Such relief would, in this case, be manifestly inadequate. It would leave the fraud-doers simply convicted of fraud, but untouched by the legal consequences of their own acts. In *Ross* v. *Estates Investment Co., L. R.* (3 *Eq. Cas.*) 122, and in *Kent* v. *Land and Brickmaking Co., L. R.* (4 *Eq. Cas.*) 588, a decree was made against all the defendants for the sum fraudulently obtained. These cases, in my opinion, declare the correct rule. All who get gain by fraud must bear the legal consequences of the wrong they do. When a fraud is committed in the name, and under cover of a corporation, by persons having the right to speak for it, for their personal gain and benefit, they are bound to answer personally for their wrongful acts. Their tongues uttered the false words and their purses should pay the damages. In this case the defendants constituted the whole proprietorship of the corporation, and they merely employed the corporate name the more effectually to accomplish their purposes against the complainant.

The complainant is entitled to a decree abrogating his contract, and requiring the defendants to refund to him the sum paid under it, with interest, together with his taxed costs   I will advise accordingly.