26 A.3d 430

WILLIAM W. ALLEN AND VIVIAN ALLEN, PLAINTIFFS–RE-
SPONDENTS, v. V AND A BROTHERS, INC., D/B/A CALIPER
FARMS NURSERY AND LANDSCAPING SERVICES, DEFEN-
DANTS, AND ANGELO DIMEGLIO, THE ESTATE OF VIN-
CENT DIMEGLIO, DECEASED; AND THOMAS TAYLOR, INDI-
VIDUALLY, DEFENDANTS–APPELLANTS.

Argued February 28, 2011—Decided July 7, 2011.

*Paul J. Maselli* argued the cause for appellants (*Maselli Warren*, attorneys).

*George T. Dougherty* argued the cause for respondents (*Katz & Dougherty*, attorneys; *Mr. Dougherty* and *Jack A. Butler*, on the briefs).

*Joshua T. Rabinowitz*, Deputy Attorney General, argued the cause for amicus curiae Attorney General of New Jersey (*Paula T. Dow*, Attorney General, attorney; *Andrea M. Silkowitz*, Assistant Attorney General, of counsel).

*Gavin J. Rooney* submitted a brief on behalf of amicus curiae New Jersey Lawsuit Reform Alliance (*Lowenstein Sandler*, attorneys; *Mr. Rooney* and *Jamie R. Gottlieb*, on the brief).

*Eric L. Probst* submitted a brief on behalf of amici curiae Northeast Spa and Pool Association, New Jersey Landscape Contractors Association, National Kitchen and Bath Association, Community Builders and Remodelers Association and Builders League of South Jersey (collectively, the "Home Improvement Associations") (*Porzio, Bromberg & Newman,* attorneys; *Mr. Probst* and *Raquel S. Lord,* on the briefs).

Justice HOENS delivered the opinion of the Court.

This appeal involves two related questions that require us to consider the grounds for imposing individual liability based upon a violation of the Consumer Fraud Act (CFA), *N.J.S.A.* 56:8–1 to –20.

The first question concerns the interplay between CFA claims brought against corporate entities and individual employees or officers who are also named as defendants. More specifically, we consider whether, and under what circumstances, the owners and employees of a corporation may be individually liable for CFA violations that are directly attributable to acts undertaken by them through the corporate entity.

The second, and related, issue concerns whether those individuals may be barred by the doctrine of collateral estoppel from relitigating the quantum of damages assessed by a jury in the context of a trial in which only the corporate defendant was represented.

## I.

We derive our recitation of the facts that give rise to the issues on appeal from the testimony offered at trial. In doing so, however, we recognize that the factual record relating to the individual defendants is constrained because the trial proceeded with only the corporation as a defendant. That is, although two of the individual defendants appeared at trial and testified as fact witnesses they did so after they had been dismissed as parties and they were not represented by individual counsel at trial. More-

over, the record does not reflect that either of them was even present during the trial save for the day on which each was called to testify.

With that caveat concerning the facts that can be derived from the record, it is clear that, at its core, this is a dispute between plaintiffs William and Vivian Allen and the corporate and individual defendants they hired to perform work on their house and grounds. Although it is largely a dispute concerning the quality of the work performed, plaintiffs also allege that defendants violated three separate regulations governing home improvements. Those regulatory violations form the basis for plaintiffs' CFA claims against the corporation as well as the individuals.

### A.

Plaintiffs lived in Skillman, during which time an entity known as Caliper Farms performed landscaping work on their property. At all times relevant to this dispute, Caliper Farms was the name through which the corporate defendant, V and A Brothers, Inc., did business. At the time when the events giving rise to this dispute were unfolding, the corporation was wholly owned by two brothers, Vincent and Angelo DiMeglio. After the dispute arose, but before this lawsuit was filed, Vincent passed away, and Angelo purchased Vincent's shares of V and A Brothers, Inc. from Vincent's estate, thereby becoming the sole owner of the corporation.

In 2002, plaintiffs purchased a home in Princeton Township that was in need of landscaping. Because they had been satisfied with the work performed by Caliper Farms on their home in Skillman, they engaged defendant V and A Brothers, Inc. to do the landscaping work at the Princeton property. As part of the work at the residence in Princeton, plaintiffs planned to build an in-ground swimming pool in the backyard of the home. Because the lot on which the Princeton home was built was steeply sloped, the scope of that work included building a retaining wall and creating a level area on the property where the pool could be installed. Plaintiff

contracted with V and A Brothers, Inc. to level the property and build the retaining wall, but hired a separate company to install the pool.

Angelo testified that his brother Vincent, who was several years older than he, had started the business and acted as the on-site manager for the work that the corporation performed. In contrast, Angelo attended to administrative matters and, although he occasionally visited sites and observed work in progress, he played a more limited role in the field than did Vincent. In addition to Angelo and Vincent, the corporation had one full-time employee, Thomas Taylor. Taylor was their sales representative and served as the corporation's principal contact with plaintiffs. He was responsible for designing the landscaping layout and evaluating the way the backyard could be configured to accommodate the pool, a task that was complicated not only by the steep slope at the rear of the property, but by wetlands restrictions and zoning constraints as well.

Plaintiffs assert that they hired V and A Brothers, Inc. to level off the slope and build the retaining wall based on their discussions with Taylor. The parties' agreement concerning the grading of the slope and the construction of the wall was not reduced to writing, but all parties agree that the estimated price was $160,000. Although V and A Brothers, Inc. designed the layout of the project, defendants relied on their block distributor, E.P. Henry, and an engineering firm, Earth Engineering, for the design of the retaining wall and for the job specifications relating to that aspect of defendants' work. According to plaintiffs, the agreed-upon work included specifications about the type and quality of backfill that could be used and that fixed the maximum height of the retaining wall. Both the backfill and the wall height eventually became sources of disagreement between the parties.

The construction of the retaining wall required the use of backfill to support the wall. There are, however, many varieties, types, and grades of backfill, each of which is capable of supporting different amounts of weight. As a result, the plans for this

retaining wall specified the type of backfill required for the job. Plaintiffs assert that V and A Brothers, Inc. did not use the specified backfill, but instead substituted an inferior grade of fill that defendants trucked to plaintiffs' property from one of defendants' other construction sites. Both Angelo and Taylor testified that Vincent was responsible for obtaining backfill that was appropriate for the job.

The plans also specified that the wall would be twelve feet, four inches in height. As the overall project proceeded, however, the construction of the pool changed in two ways. First, the pool installation was impacted by subsurface conditions that were apparently unanticipated. As a result, when the other contractor completed the pool installation, the actual elevation of the pool was higher than had been expected. Second, in order to create a large enough area to install the pool, the retaining wall needed to be moved out as compared to the original plan. Moving the wall required that it be located farther down the existing slope on the property. Taken together, these two alterations meant that had the retaining wall been installed as designed, the top of it would have been below the level at which the pool was actually constructed. V and A Brothers, Inc. therefore increased the height of the retaining wall to conform with the elevation of the pool, resulting in a finished wall that significantly exceeded the height specified in the plan.

Rather than the twelve-foot, four-inch height included in the plan, the completed wall was eighteen feet, four inches high. Taylor testified that there was nothing in the engineering plan to indicate that the specified height of the wall represented the maximum permissible height, but he conceded that he did not consult further with the engineers while building a wall that exceeded the planned height by nearly fifty percent.

After V and A Brothers, Inc. completed the work but before it obtained final municipal approval for the construction, plaintiffs paid in full for all of the work that had been performed. It

appears from the record that plaintiffs never received final municipal approvals for the work.

According to plaintiffs, not long after the wall was built and the swimming pool was installed, they began to notice defects in the work. First, they observed that the pool began to show signs that it was tilting in place, as evidenced by the fact that they could see that the water level at one side was significantly higher than it was at the other side. That defect was later confirmed by a formal survey. At about the same time, plaintiffs noticed that the retaining wall had developed a visible bulge in its middle section, and that cracks had begun to appear in the face of the wall.

After they saw what they perceived to be evidence of defective work, plaintiffs hired an engineer to investigate. According to their engineer, the retaining wall showed excessive bulging, which was caused by lateral spreading of the blocks at its corner. The engineer opined that this movement of the retaining wall would continue and that it would eventually cause the pool to crack and leak. The engineer attributed the movement of the wall to two causes, each of which he concluded was the fault of V and A Brothers, Inc. In the expert engineer's opinion, the movement of the retaining wall was directly caused by its excessive height and by the inferior backfill that had been used to support it. Furthermore, the expert engineer concluded that the retaining wall, as constructed, did not comply with industry standards.

## B.

Plaintiffs filed their two-count complaint naming both corporate and individual defendants. The first count was directed solely to V and A Brothers, Inc., the corporate defendant. That count alleged that the corporation breached its contract with plaintiffs by improperly constructing the retaining wall and by using inferior backfill, which plaintiffs asserted had resulted in substantial property damage.

The second count of the complaint was directed to the corporation, but also asserted claims individually against Angelo and

Vincent's estate, the two owners of the corporation, and against Thomas Taylor, the company's employee. That count of the complaint alleged three violations of the CFA: (1) the failure to execute a written contract, as required by *N.J.A.C.* 13:45A–16.2(a)(12); (2) the failure to obtain final approval for the construction before accepting final payment, as required by *N.J.A.C.* 13:45A–16.2(a)(10)(ii); and (3) the failure to obtain plaintiffs' consent before modifying the design of the retaining wall and substituting the inferior backfill material, as required by *N.J.A.C.* 13:45A–16.2(a)(3)(iv).

Before trial, the parties filed cross-motions for partial summary judgment. Plaintiffs moved for partial summary judgment against all defendants for the violation of *N.J.A.C.* 13:45A–16.2(a)(12), based on defendants' failure to provide them with a written contract. The individual defendants moved for summary judgment on all claims against them, arguing that only the corporate entity, V and A Brothers, Inc., could be liable for the claimed violations of the CFA.

The trial court granted plaintiffs' motion for partial summary judgment against V and A Brothers, Inc., concluding that the corporation's failure to execute a written contract violated *N.J.A.C.* 13:45A–16.2(a)(12) and entitled plaintiffs to recovery under the CFA.

On the same date, the trial court also granted the motion to dismiss the complaint against the individual defendants. Reasoning that the CFA did not create a direct cause of action against the individuals, the court instead applied a traditional veil-piercing approach to plaintiffs' claims against the individuals. Because plaintiffs had not alleged that the individual defendants engaged in common law fraud, used the corporation as their alter ego, misused the corporation, or intentionally made false representations about the corporate status, the court concluded that there was no basis on which plaintiffs could recover from them individually. The trial court's order granting the motion filed by the individual defendants left only the corporate entity as a defendant.

Plaintiffs' remaining claims, charging the corporation with breach of contract and with the CFA violations based on the failure to obtain final approval and the failure to secure written consent to alter the wall design and to substitute the different backfill, were tried before a jury in 2008. The jury returned a verdict in favor of plaintiffs and against the corporation on all counts, awarding damages of $100,000 for breach of contract, $25,000 for the failure to execute a written contract, $25,000 for the failure to obtain final approval, and $80,000 for modifying the design and substituting material without plaintiffs' knowledge or consent.

The damages on the three CFA claims, which totaled $130,000, were trebled, resulting in an award of $390,000. Together with the damages for breach of contract, the total award was $490,000, to which attorneys' fees in the amount of $78,632.10 were added.

After V and A Brothers, Inc.'s motion for a judgment notwithstanding the verdict was denied, it did not pursue an appeal. Plaintiffs, however, appealed the pretrial order granting summary judgment in favor of the individual defendants.

## C.

The Appellate Division, in a published opinion, reversed the trial court's order dismissing the claims against the individual defendants. *Allen v. V & A Bros., Inc.*, 414 *N.J.Super.* 152, 155, 997 *A.*2d 1067 (App.Div.2010). Finding support for individual liability in the statutory language that defines a violation of the CFA as the commission of an "unlawful practice" by a "person," *id.* at 156, 997 *A.*2d 1067, and relying on precedents in which liability was imposed "upon individuals who were principals or employees of corporations ... and who directly participated in the conduct giving rise to CFA liability," *ibid.*, the panel found no impediment to plaintiffs' claims against the individuals, *id.* at 156–58, 997 *A.*2d 1067 (citations omitted).

Having concluded that plaintiffs were entitled to proceed on the individual claims that had been dismissed, the panel remanded the

matter for a determination of whether any of the individual defendants had personally participated in the regulatory violations that formed the basis for plaintiffs' CFA complaint. *Id.* at 160, 997 *A.*2d 1067. In doing so, the panel barred the individual defendants from relitigating damages, noting that "a jury has already determined the quantum of damages flowing from each of the regulatory violations." *Ibid.* Thereafter, in an unpublished order, the panel moderated that directive somewhat, recognizing that the liability of any particular individual defendant might not be coextensive with that of the corporation. The panel therefore permitted the individuals to contest the extent of their personal liability on remand, but continued to preclude relitigation of the overall quantum of damages found by the jury in the trial against the corporate defendant.

We granted defendants' petition for certification, in which they challenge the conclusions of the appellate panel as to both the basis for imposing individual liability and the limitation on their ability to litigate the quantum of damages that can be assessed against them individually. 204 *N.J.* 40, 6 *A.*3d 443 (2010). We thereafter granted leave to the Home Improvement Associations, the New Jersey Lawsuit Reform Alliance, and the Attorney General of the State of New Jersey to participate as amici curiae.

## II.

The individual defendants urge us to reverse the Appellate Division's conclusion that they can be individually liable to plaintiffs for several reasons. First, they argue that the term "person" as used in the CFA should be narrowly construed, asserting that although the panel's decision accords with a literal interpretation of the wording of the statute, it is incompatible with legislative intent. They assert that the CFA's references to persons are not designed to impose individual liability upon principals and employees of corporations. They argue that the term instead serves to prevent corporations from avoiding liability to consumers by disavowing an employee's conduct and to ensure that corporations will

be liable for acts of employees even absent proof of a theory such as negligent supervision or respondeat superior.

Second, they contend that the Appellate Division erred by imposing individual liability without requiring plaintiffs to prove that there are grounds for piercing the corporate veil, thereby interpreting the CFA so as to supplant the ordinary operation of the Business Corporation Act, *N.J.S.A.* 14A:1–1 to :17–18. They assert that the Appellate Division misconstrued precedents that, although permitting CFA claims against a corporation's principal to proceed, rested individual liability not on the statutory definition of "person," but on the veil-piercing conduct of the principal. *See New Mea Constr. Corp. v. Harper,* 203 *N.J.Super.* 486, 497 *A.*2d 534 (App.Div.1985). Moreover, they contend that the panel erred by finding no distinction between imposition of personal liability on individuals based on technical regulatory violations and imposition of personal liability based on an individual's affirmative acts or intentional omissions.

Defendants also urge this Court to conclude that the Appellate Division erred in precluding or limiting their ability to contest the quantum of damages. They argue that the panel's directive circumscribing their proofs violates their right to due process because the only defendant at trial was the corporation and their participation was limited to their appearances as fact witnesses. They further assert that, in the absence of some proof of privity with the corporation, the panel's directive amounts to an erroneous imposition of collateral estoppel against them. Alternatively, defendants argue that even if the record demonstrated that all the elements of collateral estoppel were present, it would be unfair to apply it against parties who were unrepresented at trial and who could not have known that they were at risk of entry of judgment against themselves personally.

Plaintiffs urge this Court to affirm the Appellate Division's analysis in its entirety. They assert that the plain language of the CFA permits imposition of individual liability and that the Appellate Division's reading of the CFA accords with legislative intent.

They urge this Court to reject defendants' arguments regarding veil-piercing as being irrelevant to the statutory cause of action. In the alternative, they assert that they should be afforded the benefit of veil-piercing because there is ample evidence in the record that these individuals disregarded the corporate form. Further, plaintiffs argue that because the three individual defendants comprised the entire corporation, application of the participation analysis would also result in a finding of individual liability. Finally, plaintiffs urge this Court to reject the suggestion that there is a ground on which to distinguish between regulatory violations and affirmative acts when imposing individual liability pursuant to the CFA.

Plaintiffs counter defendants' arguments about damages by pointing out that defendants participated in the trial and by arguing that defendants' collateral estoppel arguments are irrelevant because that doctrine did not form the basis of the Appellate Division's decision. Substantively, plaintiffs assert that because there is an identity of interest between the corporation and the individual defendants, precluding the individual defendants from relitigating damages is warranted.

Amici Home Improvement Associations urge this Court to reverse the judgment of the Appellate Division, arguing that individual liability for violations of the CFA must rest on a traditional veil-piercing analysis that was absent here.

Amicus New Jersey Lawsuit Reform Alliance also urges us to reverse the panel's judgment, but asserts that the appropriate vehicle for imposition of individual liability for CFA violations is the tort participation theory that this Court has previously adopted in similar circumstances. *See Saltiel v. GSI Consultants, Inc.*, 170 *N.J.* 297, 788 *A.*2d 268 (2002).

Amicus Attorney General argues that this Court should affirm the Appellate Division's judgment, albeit with some alterations. Although agreeing that CFA violations, including regulatory violations, can support a finding of individual liability, the Attorney General asserts that the participation theory should supplement,

rather than supplant, individual liability pursuant to the CFA and suggests methods to limit the ability of the individual defendants to evade liability.

## III.

Our consideration of the appropriate parameters of individual liability requires that we analyze both the language used in the CFA and the traditional theories utilized by courts to impose personal liability in circumstances in which acts are undertaken through, or in conjunction with, a corporation. In this context, we must consider not only the relationship between the CFA and traditional veil-piercing theories, but must look as well to the alternative approach known as the tort participation theory, *see Saltiel, supra,* 170 *N.J.* at 303–05, 788 *A.*2d 268, that the parties have suggested might be appropriate.

## A.

The principles governing statutory interpretation are both well-established and familiar, but bear repeating. In interpreting a statute, our role "is to determine and effectuate the Legislature's intent." *Bosland v. Warnock Dodge, Inc.,* 197 *N.J.* 543, 553, 964 *A.*2d 741 (2009). In doing so, we "look first to the plain language of the statute, seeking further guidance only to the extent that the Legislature's intent cannot be derived from the words that it has chosen." *Pizzullo v. N.J. Mfrs. Ins. Co.,* 196 *N.J.* 251, 264, 952 *A.*2d 1077 (2008). In general, we read the words that were chosen "in accordance with their ordinary meaning," *Marino v. Marino,* 200 *N.J.* 315, 329, 981 *A.*2d 855 (2009), or, in the case of technical terms, "in accordance with those meanings," *In re Lead Paint Litig.,* 191 *N.J.* 405, 430, 924 *A.*2d 484 (2007), and we do not "presume that the Legislature intended something other than that expressed by way of the plain language," *O'Connell v. State,* 171 *N.J.* 484, 488, 795 *A.*2d 857 (2002).

## B.

We need not recite the historical underpinnings of the CFA, which have been explained previously by this Court, *see Cox v. Sears Roebuck & Co.*, 138 *N.J.* 2, 14–15, 647 *A.2d* 454 (1994), save for the observation that the Act is remedial legislation, which "should be construed liberally in favor of consumers." *Id.* at 15, 647 *A.2d* 454 (citations omitted). Instead, we begin with the language that the Legislature used in the CFA, two sections of which are directly relevant to our analysis.

First, the CFA uses the term "person," which the statute itself defines:

The term "person" as used in this act shall include any natural person or his legal representative, partnership, corporation, company, trust, business entity or association, and any agent, employee, salesman, partner, officer, director, member, stockholder, associate, trustee or cestuis que trustent thereof[.]

[*N.J.S.A.* 56:8–1(d).]

Second, however, the cause of action that the statute creates, although it utilizes as a central concept the term "person," is broadly defined as follows:

The act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby, is declared to be an unlawful practice[.]

[*N.J.S.A.* 56:8–2.]

In addition to these statutory provisions, our analysis of individual liability in this matter also requires consideration of the three regulations that formed the basis for the CFA claims against the corporate and individual defendants. Each of the regulations was promulgated by the Attorney General, pursuant to statutory authority, *see N.J.S.A.* 56:8–4 (providing that "the Attorney General, in addition to other powers conferred upon him by this act, may ... promulgate such rules and regulations, ... which shall have the force of law"), as part of an effort to regulate the home

improvement industry through the "Home Improvement Practices" regulations, *see N.J.A.C.* 13:45A–16.1 to –16.2.

The "Home Improvement Practices" regulations set forth a variety of acts or omissions that, by definition, "shall be unlawful," *N.J.A.C.* 13:45A–16.2(a), and that therefore constitute violations of the CFA. The first of the regulations at issue in this appeal relates to the requirement that home improvement contracts, and all changes to those contracts, be in writing, be signed by the parties, and include specific information:

> Home improvement contract requirements-writing requirement: All home improvement contracts for a purchase price in excess of $500.00, and all changes in the terms and conditions thereof shall be in writing. Home improvement contracts which are required by this subsection to be in writing, and all changes in the terms and conditions thereof, shall be signed by all parties thereto, and shall clearly and accurately set forth in legible form and in understandable language all terms and conditions of the contract, including, but not limited to, the following:
>
> i.  The legal name and business address of the seller, including the legal name and business address of the sales representative or agent who solicited or negotiated the contract for the seller;
>
> ii.  A description of the work to be done and the principal products and materials to be used or installed in performance of the contract. The description shall include, where applicable, the name, make, size, capacity, model, and model year of principal products or fixtures to be installed, and the type, grade, quality, size or quantity of principal building or construction materials to be used. Where specific representations are made that certain types of products or materials will be used, or the buyer has specified that certain types of products are to be used, a description of such products or materials shall be clearly set forth in the contract;
>
> iii.  The total price or other consideration to be paid by the buyer, including all finance charges. If the contract is one for time and materials, the hourly rate for labor and all other terms and conditions of the contract affecting price shall be clearly stated;
>
> iv.  The dates or time period on or within which the work is to begin and be completed by the seller;
>
> v.  A description of any mortgage or security interest to be taken in connection with the financing or sale of the home improvement; and
>
> vi.  A statement of any guarantee or warranty with respect to any products, materials, labor or services made by the seller.
>
> [*N.J.A.C.* 13:45A–16.2(a)(12).]

The second of the regulations that is implicated in this appeal relates to obtaining final approval for the work prior to accepting final payment from the customer:

Where midpoint or final inspections are required under state laws or local ordinances, copies of inspection certificates shall be furnished to the buyer by the seller when construction is completed and before final payment is due or the signing of a completion slip is requested of the buyer.

[*N.J.A.C.* 13:45A–16.2(a)(10)(ii).]

The final regulation relevant to our analysis addresses substitutions made without the customer's consent or knowledge. That regulation begins with a declaration that certain practices are unlawful, one of which is "bait selling," and which includes:

Substitut[ion of] products or materials for those specified in the home improvement contract, or otherwise represented or sold for use in making of home improvements by sample, illustration or model, without the knowledge or consent of the buyer[.]

[*N.J.A.C.* 13:45A–16.2(a)(3)(iv).]

## C.

With these essential statutory and regulatory provisions to serve as the guide for our analysis, our consideration of whether individuals who have an ownership interest in, or who are employed by, a corporation can be individually liable for CFA violations must begin with the statutory language. Focusing first on the statute's definition of person, *N.J.S.A.* 56:8–1(d), there can be no doubt that the CFA broadly contemplates imposition of individual liability. That definition not only begins with a reference to natural persons, but also identifies numerous other categories into which an individual might fall, including individuals who are acting through or on behalf of corporations and other business entities. *Ibid.* The very breadth of the definition itself lends strong support to the proposition that, at least in theory, the CFA permits the imposition of individual liability upon one whose acts are part of a violation by a corporation.

Our analysis of the CFA, however, cannot end there, because the definitional section does not itself create the basis for liability. Defining the term "person" merely identifies the universe of actors who may engage in the behavior that the statute defines to be the violation; it does not independently create a basis for their liability. *See N.J.S.A.* 56:8–1(d). Rather, liability can only be imposed in accordance with the operative provision of the CFA,

which has as its focus the "act" that is defined as a violation of the statute's protections. *See N.J.S.A.* 56:8–2.

In analyzing the meaning of that operative provision of the CFA, we have long recognized that it protects consumers who have fallen prey to three separate kinds of unlawful practices. We have described these to be affirmative acts, knowing omissions, and violations of regulations promulgated pursuant to the statute. *See Bosland, supra,* 197 *N.J.* at 556, 964 *A.2d* 741 (citing *Cox, supra,* 138 *N.J.* at 17, 647 *A.2d* 454). The language of the CFA specifically identifies a variety of affirmative acts, including "deception, fraud, false pretense, false promise, [and] misrepresentation," and it also identifies as actionable "the knowing[ ] concealment, suppression or omission of any material fact," if intentional, *N.J.S.A.* 56:8–2. In addition, by referring to "unconscionable commercial practice[s]," *ibid.,* and by authorizing the Attorney General to promulgate regulations that shall have the force of law, *see N.J.S.A.* 56:8–4, the CFA permits claims to be based on regulatory violations.

In light of the broad remedial purposes of the CFA and the expansive sweep of the definition of "person," it is clear that an individual who commits an affirmative act or a knowing omission that the CFA has made actionable can be liable individually. Although the statute would also impose liability on the individual's corporate employer for such an affirmative act, there is no basis on which to conclude that the statute meant to limit recourse to the corporation, and thereby to shield the individual from any liability in doing so.

On the contrary, we have held that corporate officers and employees could be individually liable pursuant to the CFA for their affirmative acts of misrepresentation to a consumer. *See Gennari v. Weichert Co. Realtors,* 148 *N.J.* 582, 608–10, 691 *A.2d* 350 (1997). Our Appellate Division and our trial courts have likewise recognized that individuals may be independently liable for violations of the CFA, notwithstanding the fact that they were acting through a corporation at the time. *See New Mea, supra,*

203 *N.J.Super.* at 502, 497 *A.*2d 534 (remanding for consideration of individual liability of corporation's principal); *Hyland v. Aquarian Age 2,000, Inc.,* 148 *N.J.Super.* 186, 193, 372 *A.*2d 370 (Ch.Div.1977) (deferring determination of personal liability of corporation's founder pending further proceedings); *Kugler v. Koscot Interplanetary, Inc.,* 120 *N.J.Super.* 216, 251–57, 293 *A.*2d 682 (Ch.Div.1972) (imposing personal liability on corporate officer).

To be sure, in each of these instances, the individuals were not liable merely because of the act of the corporate entity and no court suggested that they could be. Instead, in each of these circumstances, courts focused on the acts of the individual employee or corporate officer to determine whether the specific individual had engaged in conduct prohibited by the CFA. *See, e.g., New Mea, supra,* 203 *N.J.Super.* at 502–03, 497 *A.*2d 534 (directing court on remand to "assess damages against [corporation's] principal ... if he finds from a review of the record and his findings that she meets the test for liability under that Act."); *Hyland, supra,* 148 *N.J.Super.* at 189, 193, 372 *A.*2d 370 (concluding that question about whether "founder, president, director of the corporation and its moving force" could be personally subjected to injunctive relief or individually liable for statutory penalty "must ·be answered affirmatively").

The opinion of the court in *Kugler* provides us with an illustration of the analysis. The Chancery Division, although applying a rather traditional alter ego approach to impose individual liability on the founder of a corporation engaged in a pyramid scheme, *Kugler, supra,* 120 *N.J.Super.* at 257, 293 *A.*2d 682 (referring to individual as being "part and parcel" of the scheme), also concluded that claims based on fraud permitted imposition of individual liability notwithstanding the use of a corporation, *id.* at 256–57, 293 *A.*2d 682 (citing *Vreeland v. N.J. Stone Co.,* 29 *N.J. Eq.* 188, 195 (Ch.Ct.) (concluding individual stockholders could be liable for deceit; rejecting defense of corporate shield), *aff'd,* 29 *N.J. Eq.* 651 (E. & A.1878)). That analysis fits squarely within the contemplation of the CFA and is consistent with our ordinary approach to

liability for fraud. *See Gennari, supra,* 148 *N.J.* at 608–10, 691 *A.*2d 350. Although one might engage in an alternative veil-piercing approach, nothing in the CFA or the relevant precedents suggests that in the absence of veil-piercing the individual employee or officer will be shielded from liability for the CFA violation he or she has committed.

The more complicated question, and the one raised directly by the facts before us in this appeal, is whether an employee or officer of a corporation may also be liable individually when the basis for the CFA claim is a regulatory violation rather than an affirmative act or a knowing misrepresentation. That question is further complicated by the fact that, for CFA purposes, regulatory violations are analyzed in terms of strict liability, *see Cox, supra,* 138 *N.J.* at 18, 647 *A.*2d 454 (citing *Fenwick v. Kay Am. Jeep, Inc.,* 72 *N.J.* 372, 376, 371 *A.*2d 13 (1977)), thus implicating notions of fairness were a regulatory violation to be utilized to impose individual liability on corporate employees and officers.

As a result, our answer to the question presented cannot be seen as a single and definitive one, because individual liability for regulatory violations ultimately must rest on the language of the particular regulation in issue and the nature of the actions undertaken by the individual defendant. Some regulatory violations will be ones over which an employee, for example, will have no input and therefore no control. An employee who merely utilizes a form contract selected by the corporate employer that contains technical violations relating to font size, *see, e.g., Kent Motor Cars, Inc. v. Reynolds and Reynolds, Co.,* 207 *N.J.* 428, 451, 25 *A.*3d 1027 (describing corporate liability for use of automobile sales form that violated regulation fixing font size promulgated pursuant to CFA), for example, could not in fairness be held individually liable for the resulting loss suffered by a customer. On the other hand, there are many regulations promulgated pursuant to the CFA that identify prohibited practices of a type that focus on the behavior of individual employees or actors and that therefore might support personal liability.

In addressing whether these individual defendants may be liable to plaintiffs, it is particularly instructive to consider the three specific regulations on which the complaint was based. The complaint charged the corporate and individual defendants with violating the regulations requiring a written contract, *N.J.A.C.* 13:45A–16.2(a)(12), prohibiting submission of a final invoice in advance of issuance of a final inspection certificate, *N.J.A.C.* 13:45A–16.2(a)(10)(ii), and forbidding substitution of a higher retaining wall and inferior backfill without permission, *N.J.A.C.* 13:45A–16.2(a)(3)(iv). Each of those regulations is included in the "Home Improvement Practices" regulations, and each imposes liability on a "seller." Like the definition of "person" in the CFA itself, however, "seller" is broadly defined to "mean[ ] a person engaged in the business of making or selling home improvements and includes corporations, partnerships, associations and any other form of business organization or entity, and their officers, representatives, agents and employees." *N.J.A.C.* 13:45A–16.1A.

In considering whether there can be individual liability for these regulatory violations, a distinction can be drawn between the principals of a corporation and its employees. The principals may be broadly liable, for they are the ones who set the policies that the employees may be merely carrying out. Therefore, if the principals have adopted a course of conduct in which written contracts are never used, in clear violation of the regulation, there may be little basis on which to extend personal liability to the employee who complies with that corporate policy. However, if the employee unilaterally concludes that an inferior product should be used in place of one specified in a contract and does so without the knowledge of the homeowner, there is little reason to construe the CFA to limit liability to the corporate employer and permit that employee to escape bearing some individual liability. As a result, although the analysis of whether there can be individual liability for regulatory violations is more complex, and although it turns on the particular facts and circumstances of the claim and the regulations, the suggestion that there can be no basis for individual liability is not one we can endorse.

These necessarily fact-sensitive determinations often will not lend themselves to adjudication on a record presented in the form of a summary judgment motion. Indeed, as this dispute demonstrates, a trial court may need to await presentation of all of plaintiff's proofs about the potential individual liability of corporate officers or employees before there is an adequate record to support a decision. That, however, does not suggest that there will never be a ground on which to conclude that individual claims cannot proceed. Instead, once an adequate record is developed and the evidence assembled, if a trial court concludes that the proofs fail to demonstrate a sufficient basis for imposition of individual liability, the court could direct a verdict in favor of one or more of the individually-named defendants. *See R.* 4:40–1.

This concept of individual liability is neither new nor does it violate the statutory protections of the Business Corporation Act, *N.J.S.A.* 14A:1–1 to :17–18. Instead, it is consistent with the related approach to individual liability that we identified as the tort participation theory. *See Saltiel, supra,* 170 *N.J.* at 303–04, 788 *A.*2d 268. In *Saltiel,* we reasoned that the officers of a turfgrass corporation could be individually liable for preparation and design of turf specifications for an athletic field, *id.* at 299, 788 *A.*2d 268, pursuant to the participation theory, *id.* at 302, 788 *A.*2d 268, but only if the claim sounded in tort. As we explained, the "essential predicate for application of the [participation] theory is the commission by the corporation of tortious conduct, participation in that tortious conduct by the corporate officer and resultant injury to the plaintiff." *Id.* at 309, 788 *A.*2d 268.

Although the *Saltiel* theory was based on tort liability, which necessitates a finding "that the corporation owed a duty of care to the victim," *id.* at 303, 788 *A.*2d 268, we observed that it is analogous to our imputation of personal liability for statutory violations. In particular, we pointed out that a similar analytical approach based on an individual's participation in a prohibited act had been applied by our courts in the context of the CFA. *Id.* at 305, 788 *A.*2d 268 (citing *Kugler, supra,* 120 *N.J.Super.* at 257, 293

A.2d 682); *see also Reliance Ins. Co. v. The Lott Group, Inc.*, 370 *N.J.Super.* 563, 580–82, 851 *A.2d* 766 (App.Div.) (applying tort participation theory to impose individual liability for violation of Construction Trust Fund Act, *N.J.S.A.* 2A:44–148), *certif. denied,* 182 *N.J.* 149, 862 *A.2d* 57 (2004).

Our clear precedents, both in the CFA context and as expressed in the tort participation theory, demonstrate that employees and officers of a corporation may be found to bear individual liability to consumers. That analytical framework does not violate the ordinarily accepted principles of liability embodied in the Business Corporation Act, but instead represents our understanding of the way in which the clear language chosen by our Legislature in defining the basis for liability for violations of the CFA can be harmonized with the usual protections for those who do business in compliance with corporate forms. Just as the *Saltiel* theory of tort participation does no violence to those corporate protections, so too does our harmonious reading of the language of the CFA comport with the Legislature's clear intent.

Even so, individual liability for a violation of the CFA will necessarily depend upon an evaluation of both the specific source of the claimed violation that forms the basis for the plaintiff's complaint as well as the particular acts that the individual has undertaken. Because the trial in this matter was limited to plaintiffs' claims against the corporation, the record before this Court is insufficient to permit a conclusive analysis of whether any of the individually-named defendants engaged in acts that suffice for this purpose, with the result that the matter must be remanded for further proceedings.

## IV.

We next turn to the contentions that the parties have raised concerning the appellate panel's remand order and the propriety of imposing constraints on the proofs that the individual defendants will be permitted to offer. After concluding that defendants could be individually liable, the Appellate Division

remanded the matter to the trial court for a determination of the level of participation, if any, by each individual in each regulatory violation. *Allen, supra,* 414 *N.J.Super.* at 160, 997 *A.*2d 1067. The panel noted, however, that a jury had already determined "the quantum of damages flowing from each of the regulatory violations," *ibid.,* thus foreclosing the individuals from attacking those amounts. Although the panel subsequently explained that the "extent of the individual's liability will . . . depend on the level of that individual's culpability, and may or may not be coextensive with the liability of the corporation for that violation," it reiterated that defendants "are not free to litigate the overall issue of damages de novo."

The Appellate Division did not specify the legal theory on which it relied in deciding to limit the proceedings on remand as it did. The individual defendants have assumed that the panel must have based its decision on collateral estoppel, a doctrine they argue has no applicability to this dispute. Plaintiffs, although initially asserting that the appellate panel did not use a collateral estoppel analysis, have urged us to conclude that there was sufficient identity of interests and participation in the trial to make application of that doctrine appropriate.

Although the panel did not refer to collateral estoppel, its order precluded relitigation of the overall quantum of damages, a result that would ordinarily implicate a collateral estoppel analysis. Collateral estoppel, which is also known as issue preclusion, prohibits relitigation of issues if its five essential elements are met. Those elements are that

(1) the issue to be precluded is identical to the issue decided in the prior proceeding; (2) the issue was actually litigated in the prior proceeding; (3) the court in the prior proceeding issued a final judgment on the merits; (4) the determination of the issue was essential to the prior judgment; and (5) the party against whom the doctrine is asserted was a party to or in privity with a party to the earlier proceeding.

[*Olivieri v. Y.M.F. Carpet, Inc.,* 186 *N.J.* 511, 521, 897 *A.*2d 1003 (2006) (quoting *In re Estate of Dawson,* 136 *N.J.* 1, 20–21, 641 *A.*2d 1026 (1994)).]

Moreover, because it is an equitable doctrine, even if all five elements coalesce, it "will not be applied when it is unfair to do so." *Id.* at 521–22, 897 *A.*2d 1003 (quoting *Pace v. Kuchinsky,* 347 *N.J.Super.* 202, 215, 789 *A.*2d 162 (App.Div.2002)). We have identified a variety of fairness factors that favor application of collateral estoppel, including "conservation of judicial resources; avoidance of repetitious litigation; and prevention of waste, harassment, uncertainty and inconsistency." *Id.* at 523, 897 *A.*2d 1003 (quoting *Pace, supra,* 347 *N.J.Super.* at 216, 789 *A.*2d 162).

We have, likewise, identified factors that weigh against application of collateral estoppel. Those factors include consideration of whether

> the party against whom preclusion is sought could not have obtained review of the prior judgment; the quality or extent of the procedures in the two actions is different; it was not foreseeable at the time of the prior action that the issue would arise in subsequent litigation; and the precluded party did not have an adequate opportunity to obtain a full and fair adjudication in the prior action.
>
> [*Ibid.* (quoting *Pace, supra,* 347 *N.J.Super.* at 216, 789 *A.*2d 162).]

Other fairness factors are found in the *Restatement (Second) of Judgments,* to which we have looked previously when considering the parameters of the doctrine of collateral estoppel, *see Hernandez v. Region Nine Hous. Corp.,* 146 *N.J.* 645, 659, 684 *A.*2d 1385 (1996). In particular, the *Restatement* has identified as factors that weigh against preclusion a concern that "treating the issue as conclusively determined may complicate determination of issues in the subsequent action" and "other compelling circumstances make it appropriate that the party be permitted to relitigate the issue." *Restatement (Second) of Judgments* § 29. As the commentary to the *Restatement* notes, "[t]he ultimate question is whether there is good reason, all things considered, to allow the party to relitigate the issue." *Id.* at Reporter's Note, cmt. j.

The individual defendants, conceding that the first four of the traditional five elements for application of collateral estoppel are apparent from the record, have limited their dispute to whether there is privity between them and the corporate defendant and

whether, even if there is privity, it would be unfair to apply collateral estoppel against them in these circumstances.

We have described the concept of privity as being "necessarily imprecise." *Zirger v. Gen. Accid. Ins. Co.*, 144 *N.J.* 327, 338, 676 *A.*2d 1065 (1996). As we have explained, " '[i]t is merely a word used to say that the relationship between the one who is a party on the record and another is close enough to include that other within the res judicata.' " *Ibid.* (quoting *Bruszewski v. United States,* 181 *F.*2d 419, 423 (3d Cir.) (Goodrich, J., concurring), *cert. denied,* 340 *U.S.* 865, 71 *S.Ct.* 87, 95 *L.Ed.* 632 (1950)). In general, " '[a] relationship is ... considered "close enough" only when the party is a virtual representative of the non-party, or when the non-party actually controls the litigation.' " *Ibid.* (quoting *Collins v. E.I. DuPont de Nemours & Co.*, 34 *F.*3d 172, 176 (3d Cir.1994)).

In a similar fashion, the *Restatement* equates privity with a finding that a non-party "controls or substantially participates in the control of the presentation on behalf of a party." *Restatement (Second) of Judgments* § 39. By way of illustration, the *Restatement* regards control of the litigation as having "effective choice as to the legal theories and proofs to be advanced [on] behalf of the party to the action [as well as] control over the opportunity to obtain review." *Id.* at cmt. c.

Applying this analytical framework to the individual defendants, there is no basis in the record to conclude that either Taylor or Vincent's estate was in privity with the corporate defendant, as a result of which neither of them can be collaterally estopped to contest damages. Taylor, who was an employee of the corporation, participated at trial only by testifying as a witness; there is no evidence in the record to suggest that he exercised any control over the litigation. Nor does the record demonstrate that Vincent's estate controlled the litigation. Although Vincent was a principal of the corporation during the events that gave rise to the dispute, neither he, nor his estate, were principals of the corporation at the time of trial. Rather, following Vincent's death, Angelo

had purchased Vincent's shares from his estate, thus leaving Angelo as the sole principal of the corporation.

That being so, only Angelo might be found to be in privity with the corporation for purposes of collateral estoppel. Nevertheless, we reject the application of the doctrine against Angelo for three reasons. First, although Angelo was the sole shareholder of the corporation during the litigation and appeared as a fact witness during the trial, the record is not sufficiently clear for us to determine whether he actually exercised control over the litigation. Second, although it is a close question, it would not be fair to apply collateral estoppel against Angelo. In light of the trial court's dismissal of the claims against the individuals, the trial proceeded only with the corporation as a defendant. As a practical matter, Angelo may have had little incentive to defend vigorously and might well have made tactical decisions that were different from those that he would have made if he were participating as a defendant whose individual liability was at stake.

Third, imposition of collateral estoppel as to the overall quantum of damages against Angelo would serve no purpose in the context of the matters to be tried on remand. Given that the other individual defendants will not be estopped to relitigate damages attributable to the CFA violations, there is no efficiency to be achieved by precluding Angelo from doing likewise. On the contrary, were only one defendant precluded on this issue, there would be a very real possibility of confusion of the jury, inconsistent results, and unfairness to the rights of the other individual defendants.

## V.

The judgment of the Appellate Division is affirmed and modified in part and reversed in part. We affirm and modify the reversal of the trial court's grant of summary judgment in favor of the individual defendants; we reverse the judgment precluding relitigation of the quantum of CFA damages; and we remand this

matter to the trial court for further proceedings consistent with this decision.

*For affirmance and modification in part/reversal in part/remandment*—Chief Justice RABNER, and Justices LONG, LaVECCHIA, ALBIN, RIVERA–SOTO and HOENS—6.

*Opposed*—None.